## *EX PARTE* WHIPPER.

1. The State Board of Canvassers is a tribunal of last resort, and from its determination of the election of a county officer, no appeal is allowed by law.

2. Where a person has been declared by the State Board of Canvassers to be the duly elected probate judge for his county, and he qualifies

and is commissioned as such, he is *prima facie* entitled to the posses-
sion of the office and its books, records, and property, without awaiting
a judgment in his favor under a proceeding in *quo warranto;* and his
predecessor in office may be committed to jail, as for contempt, for a
refusal to obey an order of the Circuit Judge directing him to surren-
der such office and property to his successor. *Code,* § 434.
3. Being so committed and still refusing to obey the order of the Circuit
Judge, the person so in contempt is not entitled to a discharge under
the writ of *habeas corpus.*

This was an application to this court in its original jurisdiction
for a discharge of the petitioner from the jail of Beaufort County
under writ of *habeas corpus.* The opinion states the case.

*Mr. S. J. Lee,* for petitioner.

*Mr. W. J. Verdier,* contra.

January 7, 1890. The opinion of the court was delivered by
Mr. Justice McGowan. This was an application in the orig-
inal jurisdiction of this court for a discharge from confinement,
under a writ of *habeas corpus.* The circumstances are somewhat
peculiar, and in order to have a clear view of the points raised,
it will be necessary to make a short statement of the facts.

It appears that the petitioner, W. J. Whipper, was judge of
probate for Beaufort County; that at the general election in No-
vember, 1888, the said W. J. Whipper was a candidate for re-
election, and one Thomas Talbird was also a candidate for the
same office; that said Talbird was declared elected by the board
of county canvassers, and upon appeal to the board of State can-
vassers at the capital, that board also declared that Talbird was
elected. He was commissioned by the governor, qualified and
entered upon the discharge of his duties as the successor of the
said W. J. Whipper. But from this decision of the State board
of canvassers at Columbia, the contestant, Whipper, gave notice
of appeal "to the Court of Common Pleas for Beaufort County;"
and upon demand made upon him by Talbird after he had ob-
tained his commission and qualified, the said Whipper refused to
deliver to the said Talbird, his successor in office, "the records,
books, and papers in his possession as said judge of probate, or

under his control, relating to said office; but the said Whipper refused to deliver the same or any part thereof to the said Talbird, and still refuses to deliver the same to him, although the term of office of the said Whipper had expired, and said Talbird had qualified as his successor in office; that at the time said demand was made, the said books and papers were in the possession of the said Whipper or under his control, and they are now under his control," &c.

These facts as stated being sworn to by Talbird before Judge Aldrich on December 18, 1888, he (Judge Aldrich) issued a rule requiring the said Whipper "to show cause before me at Barnwell Court House on December 28, 1888, at 12 o'clock m., why he should not be ordered to deliver the books, papers, records, seal, and office appurtenances of the office of judge of probate of Beaufort County, which are now withheld by the said W. J. Whipper from the said Thomas Talbird as probate judge for the County of Beaufort," &c. To this rule the respondent made return, which did not traverse the specific facts sworn to by Talbird, viz., that both the boards of county and State canvassers had declared Talbird elected, that the result had been certified to the governor, who had issued to him a commission, and he was sworn and qualified as probate judge; but making three defences: *First.* That Talbird was not elected probate judge, but, on the contrary, he, Whipper, received a majority of the legal votes cast at the election. *Second.* That the respondent had appealed from the final decision of the State board of canvassers at Columbia, declaring Talbird elected, to the Circuit Court of Common Pleas for Beaufort County, which appeal, while pending, operated as a *supersedeas* as to all other proceedings in the matter. *Third.* That if the office is improperly withheld from the relator, he has adequate remedy at law, by an action in the nature of a *quo warranto* to prove title to the same.

The judge held that the proceeding was issued under subdivision 2 of section 434 of the Code, which provides a summary method of getting possession of the books, papers, and records of an office, and applies in all cases where the *prima facie* title to the office is clear, and that the boards established by law for that purpose, having declared Talbird elected, who was commissioned

and qualified as probate judge, his *prima facie* right to the office was clear, and therefore the return was insufficient. Thus holding, he signed the following order: "On hearing the return of the respondent, which shows no sufficient cause why he should not be committed for contempt, it is ordered, that W. J. Whipper do deliver to Thomas Talbird, probate judge of Beaufort County, the books, records, and appurtenances of said office on or before 12 o'clock m., on January 23, 1889, and on his failure to do so, that the said W. J. Whipper stand committed in the county jail of Beaufort County until he comply with my order of January 5, 1889. It is further ordered, that the sheriff of Beaufort County, on receipt of an affidavit of Thomas Talbird, probate judge of Beaufort County, showing the failure of said W. J. Whipper to comply with the terms of my order of January 5, 1889, by delivering the books, records, and appurtenances of said office on or before 12 o'clock m., of January 23, 1889, take the said W. J. Whipper into custody and commit him to the county jail until the said W. J. Whipper shall purge himself of his contempt by compliance with said order of January 5, 1889," &c.

From this order the petitioner, Whipper, appealed, assigning many grounds of alleged error. That appeal, however, not being prosecuted according to law, was dismissed. But as it assigned mere *errors of law*, it could not affect the question now before us under *habeas corpus*, and need not be again referred to. Persisting in his refusal to turn over the books and papers as ordered, the said Whipper, being still in custody, now makes application to this court for his discharge from confinement, without, however, offering to turn over the books and papers, or giving any satisfactory reason for his failure to do so.

The great writ of *habeas corpus* is certainly in favor of the liberty of the citizen, but we do not understand that it was intended to be under all circumstances "a general jail delivery," but to provide a speedy means of relief from unlawful imprisonment—from a confinement without lawful warrant, without legal cause. Every superior court possesses the inherent power of attachment for contempt. It is generally exercised either to maintain the dignity of the court, or to compel the performance of some order or decree of the court, which it is in the power of the party to perform, and

which he refuses to obey. In the latter case, as here, the object is more *coercive* than *punitive*. Therefore the only question before us is, whether the attachment issued by Judge Aldrich to compel the surrender of the books and records of the probate office of the County of Beaufort *was beyond his jurisdiction—without authority of law and utterly void.*

*First.* Was the order of Judge Aldrich void, by reason of the pendency of an alleged "appeal" from the decision of the board of State canvassers, declaring Talbird elected? *Section 358* of the Code (as amended in 1887) declares that "when a judgment is rendered by a trial justice court, by the county commissioners, or any other inferior court or jurisdiction, save the Probate Court, heretofore provided for in this Code of Procedure, the appeal shall be to the Circuit Court of the county wherein the judgment was rendered, and shall amount to a *supersedeas*," &c. It will be observed that this act does not profess to give any new right of appeal, but simply declares to what court "the appeal" shall be made. The board of State canvassers sits only at the State capital, having, within its peculiar province of elections, jurisdiction over the whole State; and it would seem quite anomalous to give an appeal from a decision of such a State board to the Circuit Court of a county. It would be simply absurd. Besides, it is manifest that the legislature has provided a system for the determination of all contested elections, which is complete in itself. (See title II., chapter 8, of the General Statutes.) *Section 121* provides that "they (board of county canvassers) shall then proceed to canvass the votes of the county, and shall make such statement thereof as the nature of the election shall require, within ten days of the time of their first meeting as a board of county canvassers, and shall transmit to the board of State canvassers any protest and all papers relating to the election," &c. *Section 132* of the General Statutes provides that upon such statements "they (board of State canvassers) shall then proceed to determine and declare what persons have been, by the greatest number of votes, duly elected to such offices or either of them. They shall have power, and it is made their duty, to decide all cases under protest or contest that may arise, when the power to do so does not by the constitution reside in some other body," &c.

It is plain that all papers pertaining to contested elections go up from the county to the State board of canvassers, and from the decision of the latter no appeal is given, but in accordance therewith the commission-issues. That board, as we think, is not "an inferior court," in the sense of the act; but is in itself an appellate tribunal, before which the petitioner contested, and its decision was conclusive of the matter. See *Ex parte Childs*, 12 S. C., 111; *Grier* v. *Shackleford*, 3 Brev., 491; and *Ex parte Mackey*, 15 S. C., 323. In the case of Mackey, the court says: "It thus appears that the existing law establishes a system for ascertaining the result of elections, in which there are two boards, each with its proper functions—the county board to count the votes returned, make such statements thereof as the nature of the election shall require, and transmit to the State board any protest and all papers relating to the election; and then the State board of canvassers, who are required to meet under the call of the secretary of State, for the purpose of canvassing the votes for all officers voted for at such election, make a statement of the whole number of votes given at such election, &c., and upon such statements shall then proceed to determine and declare what persons have been. by the greatest number of votes, duly elected to such offices. It seems that in this system the State board of canvassers is the tribunal of last resort, and that as to all matters pertaining to elections its decision is final, from which there is no appeal," &c. In our judgment there was no legal appeal pending from the decision of the State board of canvassers, declaring that Talbird had been duly elected probate judge. See *Talbird* v. *Whipper*, *ante* 1, just filed by this court.

*Second.* But it is further urged that the order of attachment was premature and therefore void, for the reason that at the time it was made the title to the office had not then been finally decided; that a civil action in the nature of a *quo warranto* to try the title might still be brought, and that until that has been done and judgment of "ouster" rendered therein, the petitioner had · the right to retain the records of the office, notwithstanding Talbird had been declared elected, was commissioned and qualified, and had entered upon the discharge of his duties as probate judge. The Code, in certain cases stated, provides the means of obtain-

ing possession of the records of an office, which are of a very summary character, and, in a matter so important, obviously intended to prevent all unnecessary delay. *Subdivisions 2, 3, and 4 of section 434 of the Code* provide as follows:

(2) "If any person shall refuse or neglect to deliver over to his successor any books or papers as required in the preceding section (on demand), such successor may make complaint thereof to any judge of the Circuit or Justice of the Supreme Court, where the person so refusing shall reside; and if such officer be satisfied by the oath of the complainant and such other testimony as shall be offered, that any such books or papers are withheld, he shall grant an order directing the person so refusing to show cause before him, within some short reasonable time, why he should not be compelled to deliver the same.

"(3) At the time so appointed, &c., upon due proof being made of the service of the order, &c., if the person charged with withholding such books or papers shall make affidavit before such officer that he has truly delivered over to his successor all such books and papers in his custody, or appertaining to his office, within his knowledge, all further proceedings before such officer shall cease, and the person complained against shall be discharged.

"(4) If the person complained against shall not make such oath, and it shall appear that any such books or papers are withheld, the officer, before whom such proceeding shall be had, shall by warrant commit the person so withholding to the jail of the county, there to remain until he shall deliver such books and papers, or be otherwise discharged according to law."

It is not denied that the proceedings in this case were in precise conformity to these provisions, but the point is made that they were not applicable until after formal judgment in an action to test title to the office. It is true that the provisions cited appear in part II., title 13, chapter 2, of the Code, which abolished the writ of *quo warranto*, and substituted therefor a civil action; but it is certainly not expressly declared that they were only applicable *after judgment in such action*, with all the necessary delays incident thereto. We think that the above provisions of the Code as to getting possession of official records, must be construed in connection with the acts creating the machinery for

declaring·elections in the General Statutes hereinbefore referred
to, which, in authorizing the election to be declared, and a com-
mission to be issued, confer at least *prima facie title to the offices*,
and that is sufficient to authorize an application for possession of
the records pertaining to the office.

*In·the matter of Daniel S. Baker* (*11 How. Prac.*, 418), the iden-
tical point arose under similar provisions in the law of New York,
and it was held that "the proceedings authorized by [certain acts
referred to] to compel the delivery of books and papers by public
officers to their successors, are applicable, as against officers *de.*
*facto*, to cases where the title of the relator to the office is clear.
If the title is not clear, the remedy is by action in the nature of
a *quo warranto ;* but inasmuch as the only matters alleged by B
to impeach the title of P, related to the regularity of the election,
his *prima facie* title was clear and free from reasonable doubt,"
&c.    That case was not as strong as this in reference to the
*clearness of prima facie title.*    It arose in reference to the office
of supervisor of the town of *West Bloomfield.*    Baker was the
incumbent.    One Peck claimed to have been elected, and having
obtained his certificate of election and taken the oath of office, he
demanded all the papers, books, and records of the office, and the
demand being refused, he obtained an order that they should be
delivered to him, and upon failure to obey the order, Baker was
attached for contempt.

In delivering the judgment, Mr. Justice Strong said : "It can-
not be disputed, I think, that the facts recited, which were un-
controverted, established *prima facie* that Peck was entitled to
the office ; and this *prima facie* title was clear and free from rea-
sonable doubts, unless it were weakened and doubts created
by the matters alleged in the answer to impeach title.    Those
matters related *to the regularity of the election*, and consisted
of various irregularities and acts of misconduct.    *    *    *    If
a *prima facie* title may be assailed in this way in such proceed-
ing, then undoubtedly a question was presented which the
judge had not power to try, and it was his duty to dismiss the
petition.    The existence of facts constituting a *prima facie*
title might, I am satisfied, be controverted, as the making and
entry of the statement in the minutes of election, the alleged

minutes of the statement, and the taking of the oath, &c., and thereby so much doubt be created as to present a question of right beyond the jurisdiction of the officer; but upon the best consideration I have been able to give to the question, in the brief time allowed me for making a decision, I am inclined to think that the respondent could not, in the summary proceedings against him, go behind these facts and attack the *election for irregularity and misconduct*, and thus divest the officer of jurisdiction. The only mode in which such facts can be made available, is by action analogous to the proceeding by *quo warranto* instituted directly to try the title. The remedy of Baker was to surrender the office and the books and papers, and resort to such an action," &c., citing *The People* v. *Stevens*, 5 Hill, 616; *The People* v. *Jones*, 20 Wend., 81; *The People* v. *Vail*, 12 *Id.*, 12; *The People* v. *Seaman*, 5 Denio, 409; and other authorities.

This is, as it seems to us, conclusive. The authority created for that purpose had declared Talbird duly elected. Right or wrong, he had been commissioned, qualified, and entered upon the discharge of his duties as probate judge. *His prima facie title was clear*, and, in the language of Judge Strong in the case of Baker, the remedy of the petitioner (Whipper) was to surrender the books and papers of the office, and, if so advised, to resort to his civil action in the nature of a *quo warranto* to test the title. The records of a public office are in no sense private property. They are very important to every citizen. It is good policy to require that there should be no unreasonable delays in determining contests as to elective offices. Upon that subject especially it concerns the interest of the country that there should be an end of litigation.

We are of opinion that the imprisonment of the petitioner is not illegal, and that he should be remanded, which has been done by an order heretofore filed.