Butler J.
delivered the opinion of the Court.
The true question in this case is, whether the plaintiff, as a residuary administrator, under letters de bonis non, has a right to recover the negroes in question as a portion of the estate of Martin Collins; and that will depend very much on the question whether the property had not been legally disposed of under the former administration to Abrahatn Collins.
At the death of Martin Collins, in 1816, the negro Bet, then a girl without children, either belonged to Abraham Collins in *27 his own right, or he was capable of acquiring a legal title to her, under his letters of administration on the estate of Martin Collins. From the fact that Bet was not returned as a part of the estate of the intestate, a strong inference might be drawn that she still belonged to Abraham, in his own right. The reason assigned for the omission, is, that Bet was then in South Carolina, and therefore, at the time, not subject to the North Carolina administration. From the finding of the jury, we are bound to regard the case in the most favorable light for the plaintiff on the facts. Bet must, therefore, at the time of Martin Collins’ death, be regarded as belonging to his estate and subject to administration either in North Carolina or South Carolina. When property of an intestate is situated in different sovereignties, for qualified purposes, letters of administration may be taken out in the different jurisdictions; all, however, looking to one end, the payment of debts and the final distribution of the estate. By a common understanding under the laws of nations, the subsidiary administrators are bound to account to the principal administration of the domicil. In the case before the Court, I can see no necessity for different administrations to have been taken out on the estate of Martin Collins. For although Bet may have been temporarily absent in South Carolina, (and of that there is no certainty), she shortly afterwards returned to North Carolina, and was for many years there in the possession of Abraham Collins. So soon as he acquired the possession, the legal title vested in him by operation of law, as much so as land would vest in the heir by the death of the ancestor; and once the admininistrator acquired a title, it was a good legal title against all the world. The fact, that the title was vested by letters of administration, did not make it less a legal and perfect title. From that time, then, Abraham Collins had a right to dispose of Bet, and make a good title to her. Perhaps it was his duty to have sold her for the payment of debts; and if he had done so, who would have doubted the purchaser’s title? For some reason he kept her and her increase in his possession for five years; and then made a bill of sale, by which, if the instrument was perfect, he conveyed his legal title to his grandson, the present plaintiff. *28 Fraud generally resorts to a complication of contrivances to effect its ends—and Abraham Collins may have transferred title from himself to his grandson, to avoid the payment of his own, or Martin Collins’ debts. The title being in another, prima facie,, the negro was not liable to the debts of former owners, without there had been some enforcible lien on her; which might have been suspended by bringing the negro to South Carolina. Be all that as it may, we are called on to determine what was the legal operation and effect of the bill of sale made by Abraham Collins to Abraham E. Collins, in 1821. There is no doubt that such a bill of sale was signed and witnessed. It is said, however, there was no delivery, and that it was not recorded under the laws of North Carolina. These objections cannot avail. The bill of sale was found in the possession of Moore—and it is certain, that Abraham E. Collins, the plaintiff, sold at least two of the negroes to Moore. As early as 1826, and perhaps, that may have been about the time of his father’s death, the plaintiff assumed to be the owner of some of the negroes, if not all; and no other title has been shewn in him but the bill of sale. It would be greatly straining probability to suppose he had any other title: from the fact that it was found in the possession of Moore, it is strong evidence that he recognised its validity. For what did Moore pay money to plaintiff, and it is certain he did pay him several sums, if it was not for some of these negroes'? In buying the negroes from the plaintiff, Moore may have been only carrying out the original understanding with Abraham Collins, that is, to hold the property himself, and pay the purchase money to plaintiff, for distribution among the heirs of Martin Collins. If that view should be true, the plaintiff should be the accounting party. The declarations of Moore, that he was holding the negroes for the estate, or the heirs of Martin Collins, have been relied on as inconsistent with ownership. These declarations, if made, did not, in the estimation of the jury, go to shew that he was not the owner of some of the negroes; up to 1838, when it appears he made his last payment, Moore might very well have said that he was holding negroes for the heirs of Collins; for until that time he was holding some negroes that did not belong to him, *29 and may have belonged to Collins. After that time, but a single witness, and his character was strongly assailed, said that the purchaser, Moore, had never acknowledged that he held the negroes for Collins. On the contrary, he seemed to have used them as his own. The witness alluded to, Moore, did say that in 1839 he heard the intestate Moore say, that the negroes belonged to the heirs of Collins. To say nothing more, how common is it for the memory to be mistaken as to dates. For several years, it must have been known to plaintiff, that Moore claimed the negroes as his own ; he disposed of them in his will, which is, of all others, the most solemn assertion of title. The question naturally arises, why did the present claimants wait so long before they asserted their rights, or before letters of administration were taken out on the estate of Martin Collins. The lapse of time must always be respected in raising a presumption of right in the possession of property. To obviate the lapse of time, or rather the operation of the statute of limitations, it is said that the statute could not run until letters of administration had been taken out; and this proposition would be true, if administration had to be taken out for the purpose of getting possession of the negroes, as part of the estate of Martin Collins; but no such necessity existed, what office connected with the agency of administration remained to be done at the death of Abraham Collins? At his death, he had had at least ten years for the performance of his trust; and if, during that time, he had made an effectual transfer of his title, there would be an end of the question. In that event no title would remain for the present plaintiff. It is the policy and even the duty of the law, to have personal property vested as early as practicable, and certainly not to favor remote or state claims after a long lapse of time. If there was no necessity for this administration, then the dis-tributees of this estate might have claimed the negroes; and under ordinary circumstances their claims would have been barred by the Statute of Limitations. If the action had been brought against Moore, in his life time, a very different devel-opement of facts might have been made. It is not the province of this Court to decide on the credibility of witnesses; but *30 on reviewing the facts of this case, probabilities growing out of them would seem to be against the plaintiff. From the views which have been taken on the law, a majority of the Court think there should be a new trial.
Motion granted.
Richardson J., Evans J., and Wardlaw J., concurred.
Frost J., concurred in the result.