Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge NIEMEYER and Judge HUDSON joined.
OPINION
WILKINSON, Circuit Judge.
This case concerns the ownership of papers from the administrations of two governors of South Carolina during the Civil War. Debtor-plaintiff Thomas Law Willeox sued in United States Bankruptcy Court for a declaratory judgment that the papers were part of his estate. Defendant South Carolina contends that the papers are public property. The bankruptcy court held for the State. The district court reversed, holding that the State failed to establish that the papers constituted public property under South Carolina law of the Civil War era. Because the long possession of the papers by the Willeox family creates a presumption of ownership in their favor and the State has adduced insufficient evidence to defeat this presumption, we affirm.
I.
The debtor-plaintiff is Thomas Law Willeox (“Willeox”), a South Carolina resident whose family has lived in the state for many years. The defendants are Rodger Stroup, Director of the South Carolina Department of Archives and History, and the State of South Carolina (collectively “State”). Willcox’s ownership claims against two other defendants, his sister Kathryn Willeox Patterson and cousin John M. Willeox, await the outcome of this proceeding.
At issue in this case are approximately 444 documents from the administrations of South Carolina Governors Francis Pickens (1860-62) and Milledge Bonham (1862-64). As the district court described them, “The Documents, which date from between December 1860 and August 1864, concern Confederate military reports, correspondence, and telegrams between various Confederate generals, officers, servicemen, *411 and government officials, and related materials. The Documents also address a wide variety of official duties of the Governor during that time period.... [T]he court adopts the Bankruptcy Court’s finding of fact that the Documents are properly described as Governor’s records relating ‘to matters of military significance, police powers, as well as to other duties of the Governors during the relevant time period.’ ” The collection has been appraised at $2.4 million.
Willcox found the papers in 1999 or 2000 in a shopping bag in a closet at his late stepmother’s home. After finding the papers, Willcox sold a few of them to various individuals and gave two to his wife. In May 2004, Willcox scheduled an auction for August 7, 2004 to sell the remaining documents. The auctioneer publicized the upcoming sale and was contacted by defendant Stroup, who sought permission to microfilm the papers for the State Archives prior to auction. Willcox authorized the copying, and the papers were microfilmed. On the day before the auction, August 6, 2004, Stroup and the Attorney General’s Office for the State of South Carolina obtained a temporary restraining order in state court enjoining the sale of the papers.
On August 16, 2004, Willcox filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court of the District of South Carolina. Willcox then filed a complaint in the bankruptcy court seeking a declaratory judgment that the papers were property of the bankruptcy estate. After a two-day bench trial, the bankruptcy court held the State to be the owner of the papers under South Carolina law. The district court reversed.
Regarding the papers’ history, the bankruptcy and district courts found, and we adopt, the following facts. The papers seem to have come into Willcox’s family through his great-great-uncle, Confederate Major General Evander Mclver Law, who most likely came into possession of them during the February 1865 attack on the South Carolina capital by Union General William Tecumseh Sherman. On February 15, 1865, in anticipation of imminent attack, Governor A.G. Magrath declared martial law in Columbia and appointed General Law the Provost Marshal of the city. On February 16, 1865, a large number of State archives and records were removed from Columbia for safekeeping. On February 17, 1865, General Law was relieved of his duties as Provost Marshal, and General Sherman took control of Columbia. The parties submit no direct evidence of how General Law came into possession of the papers, nor is there any suggestion that he did so illegally.
On February 16, 1896, General Law wrote a letter to a New York book dealer regarding the sale of some letters which, both parties agree, appear to belong to the collection at issue here. By the 1940s, Mrs. Annie J. Storm, the granddaughter of General Law, was in possession of the papers and attempted to sell them to both the University of North Carolina at Chapel Hill (“UNC”) and the South Caroliniana Library of the University of South Carolina. Mrs. Storm described the documents as “original State House papers entrusted to [her] grandfather at the time of the surrender.” No sale resulted, but the papers were placed on microfilm at the Southern Historical Collection at UNC.
No evidence has been submitted of the papers’ movements between the time of the Storm correspondence and plaintiff Willcox’s discovery more than fifty years later. The point for present purposes is simply that, while the precise route by which Civil War-era gubernatorial papers arrived in a shopping bag in Thomas Law Willcox’s stepmother’s closet remains a *412 mystery, it appears that the papers have been in the possession of the Law and Willcox families for over one hundred and forty years.
The district court had jurisdiction over the initial appeal under 28 U.S.C. § 158(a). We possess appellate jurisdiction under 28 U.S.C. § 158(d). “[W]e review the bankruptcy court’s factual findings for clear error, while we review questions of law de novo. ” Logan v. JKV Real Estate Servs. (In re Bogdan), 414 F.3d 507, 510 (4th Cir.2005).
II.
The exceptional nature of the papers in dispute—their early vintage, their unknown history—presents issues distinct from those of the typical personal property case. Without the benefit of clear chain of title, evidence of original ownership, eyewitness testimony, and any number of documentary aids usually helpful in the determination of ownership, the court must utilize the legal tools that remain at its disposal. In this situation, tenets of the common law that usually remain in the background of ownership determinations come to the forefront, their logic and utility revealed anew.
That possession is nine-tenths of the law is a truism hardly bearing repetition. Statements to this effect have existed almost as long as the common law itself. See Oxford English Dictionary (draft rev. 2003) (citing a 1616 collection of adages for “Possession is nine points in the Law”). See also Frederick Pollock & Robert Samuel Wright, An Essay on Possession in the Common Law 5 (1888) (“[I]n the eyes of medieval lawyers ... Possession largely usurped not only the substance but the name of Property.”).
The importance of possession gave rise to the principle that “[possession of property is indicia of ownership, and a rebuttable presumption exists that those in possession of property are rightly in possession.” 73 C.J.S. Property § 70 (2004). The common law has long recognized that “actual possession is, prima facie, evidence of a legal title in the possessor.” William Blackstone, 2 Commentaries *196. See, e.g., Edward Coke, 1 Commentary upon Littleton 6.b. (19th ed. 1832) (strong presumption of ownership created by “contin-úan and quiet possession”); Jeffries v. Great W. Ry. Co. (1856) 119 Eng. Rep. 680 (K.B.) (“[T]he presumption of law is that the person who has possession has the property.”).
This presumption has been a feature of American law almost since its inception. “Undoubtedly,” noted the Supreme Court, “if a person be found in possession ... it is prima facie evidence of his ownership.” Ricard v. Williams, 20 U.S. (7 Wheat.) 59, 105, 5 L.Ed. 398 (1822). Almost eighty years later, the Court reaffirmed, “If there be no evidence to the contrary, proof of possession, at least under a color of right, is sufficient proof of title.” Bradshaw v. Ashley, 180 U.S. 59, 63, 21 S.Ct. 297, 45 L.Ed. 423 (1901). See also, Oliver Wendell Holmes, The Common Law 241 (1881) (“The consequences attached to possession are substantially those attached to ownership, subject to the question of the continuance of possessory rights.... ”).
In South Carolina law, too, it is well established that, absent evidence of superior title, “[t]he law ever presumes in favor of possession, for possession alone is prima facie evidence of a good title.” Gourdin v. Theus, 5 S.C.L. (3 Brev.) 153, 171 (S.C.Const.1808). See, e.g., Stephenson Fin. Co. v. Wingard (Ex parte Dort), 238 S.C.506, 121 S.E.2d 1, 3 (S.C.1961); Jackson v. Frier, 146 S.C. 322, 144 S.E. 66, 69 (1928); Thompson v. Chapman, 107 S.C. 461, 93 S.E. 142, 143 (S.C.1917). In *413 this case, the possession of the Law and Willcox families triggers the presumption of their ownership of the papers.
The presumption of possession is not confined to the early nineteenth century, nor is it confined to examples of early Americana. Rather, it applies across the law of personal property. See, e.g., Nesbitt v. Lewis, 335 S.C. 441, 517 S.E.2d 11, 14 (Ct.App.1999) (ownership of dog); Hammond v. Halsey, 287 S.C. 46, 336 S.E.2d 495, 497 (Ct.App.1985) (ownership of cannon); Clanton’s Auto Auction Sales, Inc. v. Harvin, 238 S.C. 352, 120 S.E.2d 237, 239 (1961) (ownership of automobile). The unusual circumstances of this case do, however, provide a notable illustration of why such a presumption exists in the first place.
First and foremost, the presumption operates to resolve otherwise impenetrable difficulties. Where neither party can establish title by a preponderance of the evidence, the presumption cuts the Gordian knot, determining ownership in favor of the possessor. This case shows the need for such a default rule. It presents questions the answers to which remain a mystery. Little is known of the papers’ whereabouts, status, or movements from their creation to their acquisition by General Law. There is no evidence of how General Law acquired the papers. Not even the chain of possession within the Law and Willcox families has yet been determined with any certainty. In fact, in over one hundred and forty years of existence, these papers have apparently surfaced in the historical record only three times: in General Law’s 1896 correspondence, in Annie Storm’s 1940’s correspondence, and in the current litigation.
This case thus poses questions which we are ill equipped to answer. Fortunately, however, the common law reveals its usefulness even in the acknowledgment of its limitations. The presumption of ownership from possession locates the parties’ burdens. Where the party not in possession is able to establish superior title by satisfactory evidence, the presumption gives way in favor of this evidence. But where no such evidence is produced— where, as here, the events at issue are impossible to reconstruct — the presumption recognizes and averts the possibility of a court’s presiding over a historical goose chase. See Richard A. Posner, Economic Analysis of Law 78 (6th ed.2003).
Second, the presumption of ownership in the possessor promotes stability. “It is the policy and even the duty of the law, to have personal property vested as early as practicable.” Collins v. Bankhead, 32 S.C.L. (1 Strob.) 25, 29 (S.C.Ct. App.1846). The presumption of ownership from possession is one of an array of legal principles designed to this end. The presumption means that, absent proof to the contrary, settled distributions and expectations will continue undisturbed. Even where evidence overcomes the presumption, other principles work to protect settled expectations, including the statute of limitations, the doctrine of adverse possession, and equitable defenses such as laches, staleness, abandonment, and waiver.
Such principles, working in concert, favor status-quo distributions over great upsets in property rights. At the most basic level, this fosters “the policy of protecting the public peace against violence and disorder.” See Sabariego v. Maverick, 124 U.S. 261, 297, 8 S.Ct. 461, 31 L.Ed. 430 (1888). In contemporary commercial society, it protects the expectations of those in possession, thus encouraging them to make improvements that increase social wealth. See, e.g., Richard A. Posner, Economic Analysis of Law 80-84 (6th ed.2003); Thomas W. Merrill & Henry E. *414 Smith, What Happened to Property in Law and Economics?, 111 Yale L.J. 357, 398 (2001) (“[T]he refined problems of concern in advanced economies exist at the apex of a pyramid, the base of which consists of the security of property rights.”). Without rules such as the presumption of ownership, whether public or private, such valuable goals would give way to uncertainty.
In this case, the resulting confusion is not difficult to imagine. If the State were not required to defeat the presumption in order to gain title, a whole system of archival practice could be thrown into question. The State could claim ownership of other papers of Governors Pickens and Bonham held by the Library of Congress and Duke University, as well as papers of other South Carolina governors currently at institutions other than the State Archives. The result would be immense litigation over papers held by private owners, universities, historical societies, and federal depositories. It would upset settled archival arrangements and the expectations of institutions and historical scholars alike. Disregard of possession as presumptive evidence of ownership would throw the whole of this important area into turmoil.
Finally, while it has never been the practice of federal courts to ignore the law in favor of equitable considerations, see E. Tenn. Natural Gas Co. v. Sage, 361 F.3d 808, 823 (4th Cir.2004), it is worth noting that the employment of the presumption in this case in no way frustrates the public interest. Here, private possession does not shut the papers off from access by scholars or, indeed, by the interested public. They have been available for study for decades on microfilm at the University of North Carolina at Chapel Hill, and through the permission of plaintiff Willcox the South Carolina Department of Archives and History now also has a copy on microfilm. The papers are thus freely available for perusal and study regardless of who owns the originals. And, of course, if the State values possession of the original documents, it may acquire them on the open market.
In short, the common law, through the presumption of ownership in the possessor, resolves otherwise insoluble historical puzzles in favor of longstanding distributions and long-held expectations. Such a rule both protects the private interests of longtime possessors and increases social utility. Of course, this presumption will not always cut in one direction. In many instances, the State will possess the papers, and it will then be entitled to the strong presumption that the private party claims here. In this case, however, where the Law and Willcox families have been in possession for well over a century, the presumption favors plaintiff Willcox.
III.
Having recognized the presumption in favor of 'Willcox’s ownership, the court must consider whether the State has rebutted this presumption. Under South Carolina law, the burden is on the party not in possession to prove title superior to that of the possessor. See Hammond, 336 S.E.2d at 497. In most cases, the party not in possession would attempt to meet its burden through factual evidence, such as evidence of title or of recent prior possession.[1]
*415 In this case, the State has been unable to provide such evidence. There is no documentary evidence of the State’s title, nor is there evidence of its recent possession. While there is no suggestion that the Law and Willcox families are bona fide purchasers, since no purchase was involved, there is also no indication that they acquired the papers in bad faith. In any case, the State’s burden may not be met by challenging the sufficiency of the possessor’s title but only by proving the superior strength of its claim. See id.
Given the insufficient factual evidence,[2] the State’s remaining argument for ownership is that, under the law at the time of the documents’ creation (1860-64) or their acquisition by General Law (1865),[3] they were public property. South Carolina law of the relevant time period provides no basis for the State’s claim of ownership.
A.
South Carolina case law does not suggest that such papers were public property during the Civil War era. Pinckney v. Henegan, 33 S.C.L. (2 Strob.) 250, 252 (S.C.App.L.1848), merely stated that “[t]he public records in the Secretary of State’s office do not belong to the Secretary; they are property of the State.” The case did not refer to governors’ papers or otherwise explain the nature of the records on file in the Secretary’s office. It simply stated that public records are public property. This proposition does not elucidate the underlying question of what documents qualify as public records.
The other cases cited by the State were decided years after the time period in question. See, e.g., Sternberger v. McSween, 14 S.C. 35 (S.C.1880); In re Whipper, 32 S.C. 5, 10 S.E. 579 (1890); State ex rel. Hay v. Farnum, 73 S.C. 165, 53 S.E. 83 (1905). As such, they are of questionable relevance to the common law as it existed in the early 1860s. In addition, the cases all concern other types of records than papers of executive officials. Unlike deeds of property or birth and death certificates or creditors’ liens, see Sternberger, 14 S.C. at 38, or bills of indictment, see State v. West, 31 N.C.App. 431, 229 S.E.2d 826 (1976), governors’ records have both public and private aspects. Cases involving other types of records shed limited light on whether the gubernatorial papers in question were public property.
A.
South Carolina statutory law does not indicate that gubernatorial papers were *416 public property at the relevant time. The State cites a 1719 statute addressing the preservation of public records and providing penalties for individuals who had “made away” with various records. See Act No. 405 of 1719, 3 S.C. Stat. at Large 98 (1838). The State also cites a 1789 act providing for the removal of public records to Columbia under the supervision of the governor. See Act No. 1448 of 1789, 5 S.C. Stat. at Large 102 (1839). Citation of such statutes, however, again begs the question of what documents were considered to be public records in the first place.
In addition, the State cites numerous nineteenth-century statutes, as well as the 1790 and 1861 Constitutions of South Carolina, which required the governor to submit various reports to the legislature. See, e.g., S.C. Const. of 1790, art II § 12; S.C. Const. of 1861, art II § 12; Act No. 2886 of 1843, 11 S.C. Stat. at Large 270 (1873); Act No. 4567 of 1861, 13 S.C. Stat. at Large 4 (1875); Act No. 4700 of 1864, 13 S.C. Stat. at Large 199 (1875). While these requirements might make it necessary for the governor to keep accurate records, they are not relevant to the question of the ownership of such records, let alone gubernatorial papers more broadly.
The State also references two statutes passed after the events in question. First, an Act passed by the South Carolina legislature in December 1865 provided that future governors were to have a “suitable office” called the Executive Chamber, in which all papers associated with their administration were to be kept. See Act 4754 of 1865, 13 S.C. Stat. at Large 340 (1875). The Act also provided that the Secretary of State was to “collect, deposit and keep in Columbia all the books, records, and papers heretofore belonging [to the Executive Chamber].” Id. The passage of this law in December of 1865 strongly suggests that, prior to that time, such papers were not so regulated.[4] In addition, the Act sheds no light on the question of what papers “heretofore” belonged to the Executive Chamber, and the State has provided no evidence that, prior to the passage of this Act, the papers at issue would have belonged to that category.
Second, the current South Carolina Public Records Act, S.C.Code Ann. § 30-1-10 et seq. (1991 & Supp.2005), provides for the maintenance of certain public records. This Act, which first appeared in the South Carolina Code of Laws in 1962, cannot possibly support the State’s characterization of the law as it existed in the Civil War era. Whether the Act’s definition of “public record” even now includes records of the governor’s office is a question we need not address. See S.C.Code §§ 30-4-20(a), (c).
C.
Moreover, the nineteenth-century understanding of South Carolina common and statutory law appears to support this court’s interpretation. While the State Archives has at least some records of almost every South Carolina governor since 1860, of all the State’s governors from the colonial period through 1866, the Archives contains the original papers of only one, Governor Edward Drayton (1800-02,1808-10). Governor Drayton, in fact, complained to the legislature of the “careless” approach to state papers and proposed that the legislature pass a law requiring governors to maintain indexed journals for *417 their successors. No such law was passed. Later governors continued to exercise control over their papers. A letter of May 11, 1883, from former Governor Magrath, governor at the time of Sherman’s attack, to former Governor Bonham, some of whose papers are in dispute here, suggests that some of Governor Magrath’s papers were returned to him by a later governor. The letter also states that Governor Pickens, the other governor whose papers are in dispute in this case, had many of his papers in his personal possession. This evidence suggests that governors of the Civil War era may have assumed private possession and control of gubernational papers.
Even in the twentieth century some South Carolina governors made donations of their papers more consistent with private than public ownership. Governor Strom Thurmond (1947-51) donated his papers to Clemson University. Governor Ernest F. Hollings (1959-1963) donated a portion of his papers to the University of South Carolina, as did Governor Robert McNair (1965-71). These donations suggest that even twentieth-century South Carolina governors have exercised a right of transfer over their papers, a right at the core of the bundle of rights known as property ownership. See Black’s Law Dictionary 1138 (8th ed.2004).
In this respect, the practice in South Carolina accords with common law practice more generally. Presidential papers, for example, were considered private property from the time of George Washington, who following his second term removed his papers to Mount Vernon and bequeathed them in his will to his nephew, Supreme Court Justice Bushrod Washington. See Nixon v. United States, 978 F.2d 1269, 1278 (D.C.Cir.1992). Jefferson, Madison, and Monroe also bequeathed their papers as private property by will. See id. When Congress first provided public funding for presidential libraries, such libraries depended upon former presidents to deposit their papers voluntarily. See Presidential Libraries Act of 1955, Pub.L. No. 84-373, 69 Stat. 695 (codified as amended at 44 U.S.C. § 2112 (2000)).
For Congress to change this private ownership regime required a law prospectively granting the United States “complete ownership, possession, and control” of official presidential records. See Presidential Records Act of 1978, 44 U.S.C. § 2201 et seq. (2000) (implementing process for archiving records and making them publicly available as soon as possible, subject to exceptions for confidential and privileged materials). A previous law, the Presidential Records and Materials Preservation Act of 1974, Pub.L. 93-526, 88 Stat. 1695, which exerted federal control over former President Nixon’s papers in the wake of the Watergate scandal, was determined to have effected a per se taking of President Nixon’s property interest in his papers. See Nixon, 978 F.2d at 1284.
We conclude that the State has failed to establish that South Carolina law at the relevant time treated gubernatorial papers as public property. This conclusion leaves the State with no basis upon which to rebut the strong presumption of possession in the Law and Willcox families and no basis upon which to claim title superior to that of plaintiff Willcox. We note that the district court further held that “the State is barred from asserting an ownership interest in the Documents due to the running of the statute of limitations and staleness.” While we have no reason to question this aspect of the district court’s ruling, the State’s failure to establish superior title renders it unnecessary to address it.
*418 The judgment of the district court is hereby affirmed.

AFFIRMED.

. The presumption of ownership from possession gives way to evidence of superior title. See Gourdin, 5 S.C.L. at 171 ("But whenever the claimant shews a legal title, the evidence of possession alone, unsupported by any written document, ought not to prevail. The presumption of a good title is rebutted; and other evidence than mere possession, becomes necessary.").
*415 Even if the State had been able to show evidence of superior title, however, that would not be the end of the matter. After the party out of possession establishes superior title, the possessor may still raise a number of defenses, including the statute of limitations and equitable defenses such as staleness, lach-es, waiver, and abandonment. See, e.g., O’Keeffe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980) (artist barred from reclaiming stolen paintings where she did not diligently pursue recovery of stolen works).

. The State attempts to argue that because, as a factual matter, the papers were produced during the administrations of two South Carolina governors, they are of necessity public property. This argument begs the question. The content of the papers and the conditions of their production are not in dispute. The entire question is whether gubernatorial papers such as these constitute public property. That the papers were produced in an official context is simply insufficient to demonstrate title.

. The parties have made arguments relating to both time periods. The district court framed the question in terms of the law at the time of the documents' creation but also considered the state of the law in 1865, the time of their likely acquisition by General Law. Because the two events, creation and acquisition, occur within a matter of years of each other, the choice between them does not affect the outcome.

. We need not consider what effect the December 1865 Act had on gubernatorial papers going forward. The Act provides that all papers generated during a governor’s administration should be kept in the Executive Chamber during that administration, but it does not explicitly state what should become of those papers at the close of an administration.