NOT DESIGNATED FOR PUBLICATION

No. 123,495

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

DAVE JENNINGS and EMILY MCLEOD,
*Appellants*,

v.

ELIZABETH SHAUCK,
*Appellee*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; WILLIAM P. MAHONEY, judge. Opinion filed January 20, 2023. Reversed and remanded with directions.

*Joseph W. Booth*, of Lenexa, for appellants.

*Julie J. Gibson* and *Matthew J. Brooker*, of Matteuzzi & Brooker, P.C., of Overland Park, for appellee.

Before ISHERWOOD, P.J., GREEN and BRUNS, JJ.

ISHERWOOD: Emily McLeod and Dave Jennings appeal from the district court's order quieting title to a champion show dog named Oscar. Following a series of hearings initially slated to address the motion for preliminary injunction filed by Oscar's breeder, Elizabeth (Betsy) Shauck, the district court went several steps further and held that Betsy was Oscar's sole, rightful owner. Emily and Dave assert this was erroneous because the district court failed to provide them with notice of its intent to consolidate the preliminary injunction proceeding with a trial on the merits. We agree. We also find that the court erred as a matter of law by misapplying the common law rules related to ownership of

1

personal property. The court's flawed approach resulted in prejudice to Emily and Dave by depriving them of their rightful ownership interest in Oscar.

Because a proper application of the law regarding ownership illuminates Emily and Dave's status as owners of Oscar with possessory and decision-making interests equal to that of Betsy, this case must be remanded for enforcement of those rights.

## FACTUAL AND PROCEDURAL BACKGROUND

Emily and Dave filed a Petition to Quiet Title against Betsy in September 2019. The subject of the petition was a Cane Corso show dog named Oscar. Emily and Dave claimed title and ownership of Oscar but noted that Betsy similarly claimed ownership over him. The couple requested the district court to issue an order finding title and ownership of Oscar rested solely with them. Betsy responded and asserted that Emily and Dave stole Oscar from her. She also counterclaimed for breach of contract, replevin, conversion, and quiet title, sought a temporary restraining order, and asked the court to issue a preliminary injunction ordering the immediate return of Oscar.

Both sides agreed that they formed an agreement pertaining to Oscar's ownership, but strongly disagreed as to the precise terms of that arrangement. Emily and Dave claimed that Betsy asked them to care for Oscar and they agreed to do so with the understanding that he would be their full-time pet, but Betsy could sometimes enter him into shows. They acknowledged they agreed not to neuter Oscar "so that it would be possible for [Betsy] to show Oscar if it turned out that showing him was a good option." Emily and Dave then claimed that Betsy refused to return Oscar to them following a dog show in 2019 and simply informed them Oscar would be living with someone in Maryland for the next several years while she took him to dog shows whenever she desired. Emily and Dave responded to the news by traveling a great distance to "re-acquire possession of Oscar" in September 2019.

2

Not surprisingly, Betsy viewed the parties' arrangement through a different lens. She claimed that Emily and Dave merely agreed to provide a "guardian" or pet home for Oscar which simply ensured he received ordinary daily care. Under Betsy's interpretation of the agreement, she retained ownership, control, and the decision-making authority over all aspects of Oscar's training, boarding, showing, and breeding for the duration of his potential "show" career. She also noted that she agreed to be responsible for the expenses incurred in relation to that endeavor. Betsy further asserted that the parties agreed that when Oscar's show career ended, he would retire as a pet to Emily and Dave and ownership would transfer to them at that time. According to Betsy, Emily and Dave adhered to the terms of this agreement for a couple of years but then began objecting to how Oscar was handled when outside their care. Their discontent peaked in September 2019 and culminated in Dave's trek to Virginia to surreptitiously reclaim Oscar from a show.

In response to Betsy's filings, the court issued a notice of hearing specifically advising the parties of its intent to address her request for a preliminary injunction in April 2020. The COVID-19 pandemic required a continuance of the matter, so the hearing did not ultimately begin until October 14, 2020, and was then heard over the course of three separate days.

Before the hearing, the parties exchanged detailed witness and exhibits lists, and filed trial briefs devoted to the issue of Betsy's request for a preliminary injunction and the analytical standards governing the same. Because a litigant pursuing such relief must show a likelihood of success on the merits of his or her claim, the parties also discussed the merits of Betsy's counterclaims. In their trial brief, Emily and Dave also argued that the statute of frauds prohibited Betsy "from attempting to enforce her alleged agreement" because it was not reduced to writing and would take more than one year to complete.

3

Throughout the case, the parties distinguished between "pet homes" and "guardian homes." A pet home, also called a companion home or non-breeding home, is where a dog goes to be a pet. By contrast, a guardian home, also called a show home, is a home where a dog lives when it is not being used for some other purpose like showing or breeding. Although guardian home agreements differ, they can involve co-ownership of a dog with each party having different rights and responsibilities. A guardian home arrangement may be beneficial for a person who could not otherwise afford a purebred dog, or for a person who is interested in exploring participation with show dogs but prefers to first work with and learn from someone with greater experience in the activity. Finally, if a dog performs well at shows, it may be campaigned. Campaigns can involve extensive travel and showing and may require a dog to be absent from its guardian home for a year or two.

Over the extended course of the hearing on Betsy's request, several people testified that guardian and pet home agreements were common. They also asserted that every situation was different; thus, such agreements were usually reduced to writing.

By virtue of the testimony adduced, the court learned that Emily first became acquainted with Betsy and her husband, Dennis, through her work as an animal chiropractor. Betsy worked full time as a railroad engineer, but owned and bred Cane Corso dogs, like Oscar, as a hobby. When Betsy's dog Gabby had a litter of puppies, Emily provided chiropractic care for Gabby and the litter. Emily and Dave spent a lot of time with the puppies so that in exchange for the chiropractic care, Betsy sold one of the puppies, Gracyn, to the couple for the cost of her out-of-pocket veterinary expenses related to Gracyn. Dave testified that Betsy intended for Gracyn to be a gift, but he and Emily offered her money to cover her hard costs because they were not comfortable receiving something for nothing. There was no written contract covering Betsy's transfer of Gracyn to Emily and Dave.

Betsy acknowledged that she typically enters into written contracts with people who purchase her dogs. Under the terms of her standard contract, female dogs must be spayed and male dogs are required to carry a limited registration with the American Kennel Club (AKC) and are not allowed to be bred. According to Betsy she deviated from this practice with Emily and Dave for Gracyn because she trusted them.

The friendship between Betsy, Dennis, Emily, and Dave continued to flourish. Betsy had a big back yard, so Emily and Dave visited so that Gracyn could exercise and play with Betsy's other puppies. Emily and Dave were present when Gabby had another litter of puppies in May 2017; Oscar was one of the puppies born into that litter. The couple continued visiting Betsy and Dennis after Oscar was born and Emily provided chiropractic care for the litter.

Unfortunately, 2017 also saw a marked decline in Dennis' health. By summertime, it presented quite a challenge for Betsy to tend to his needs and provide adequate care for all the dogs. Emily and Dave continued to lend their assistance and in the fall of that year the subject of Emily and Dave assuming care of Oscar arose. The parties have varying recollections of the conversation on this subject, so each will be summarized.

Betsy testified that she and Dennis met with Emily and Dave when Oscar was four months old and talked about them potentially taking the dog. She asserted that she stressed to Emily and Dave that she wanted to show Oscar "to his maximum potential." Betsy admitted that a dog's potential is not always known at such a young age but made sure the couple understood every possible scenario that could happen with Oscar. She also wanted them to understand that Oscar was potentially campaignable, and that such an endeavor could entail long periods away from Emily and Dave so Oscar could reside with a handler for at least a year. Betsy also claimed they covered breeding rights and the couple's obligation to make the dog available to her for breeding.

5

According to the terms testified to by Betsy, she would cover Oscar's breeding, handling, and showing costs and then Oscar would return to Emily and Dave as their permanent pet once his show career ended. The parties also allegedly agreed to equally split stud fees generated from breeding. Although Betsy entered into written contracts covering the other dogs in Oscar's litter, she did not draw one up for Oscar. Rather, in this instance, despite believing Oscar had remarkable potential, she simply asked whether Emily and Dave wanted to reduce their agreement to writing. The couple allegedly declined with the claim that such formalities were unnecessary. Emily and Dave did not pay Betsy any money for Oscar.

Dave offered a different version of events. According to him, Dennis and Betsy asked him and Emily to take Oscar as a pet because their circumstances demanded that they find a new home for him. Dave asserted that Betsy requested they not neuter Oscar because she may opt to return to showing dogs in the future. According to Dave, Betsy never communicated that his and Emily's relationship with Oscar was limited to that of a guardian home. Rather, quite the opposite was true—Betsy looked him in the eye and stated, "I just want you to know, he's your dog," and if her intent were otherwise the couple never would have agreed to take Oscar in.

Emily's recollection of events was much like Dave's. She testified that Betsy and Dennis requested that they take Oscar and make him part of their family, and the couple happily agreed to do so. When this discussion occurred, Emily had other clients with show dogs so she understood the difference between pet homes and show homes and never would have assented to simply providing a guardian home for Oscar. Emily testified that Betsy asked them not to neuter Oscar because that would preserve her ability to show him if she opted to resume those activities. Emily denied that breeding rights were ever discussed but stated that had Betsy expressed a desire to breed Oscar she and Dave would not have offered opposition.

6

Oscar went to live with Emily and Dave in October 2017, just a few days after their conversation with Betsy and Dennis. That month also saw Betsy preparing Oscar for shows which Dave and Emily freely allowed in order to support her as a friend. She often visited Dave's office to train Oscar and took him to classes a couple of nights a week. In anticipation of his first show, Betsy registered Oscar with the AKC in early 2018. She entered Dave's name on the registration certificate alongside her own for what she claimed was merely "a safeguard." Emily did not want to be on the certificate because she feared to do so would create potential conflicts-of-interest with her other clients. Betsy entered Oscar in his first show in January 2018 where he was handled by Paul Catterson, a professional AKC-registered dog handler who worked under contract with Betsy.

Dennis died in August 2018 and Betsy gradually eased back into the show life, entering Oscar only occasionally. A week was the longest stint he was ever absent from Dave and Emily's home that year, and that only occurred twice. But his involvement was not incident free. For example, while Oscar was staying with Catterson to train for his first show, he swallowed a toy which then required surgery for its removal. Oscar also brought home an intestinal parasite from his first show and returned to Dave and Emily with a respiratory infection following his second show. He was also often plagued with diarrhea after shows.

Oscar experienced a marked increase in his participation in 2019. Between February and May of that year Betsy registered him for two shows each month. In April 2019, Oscar came home after a stay with Catterson and was down around 15 pounds from the 160 pounds he boasted before he departed. The couple was upset because Oscar's weight loss was apparently a product of his refusal to eat, a condition the couple was never apprised of. Oscar was registered for a show in Illinois at the end of May 2019, but he was not eating, and Betsy believed he was too thin and in too poor a condition to participate. She attributed this to the fact that Dave and Emily's other dog, Gracyn, was in

heat and the couple inadvertently allowed Oscar to mate with her. Dave called it an "unfortunate circumstance" but Betsy still insisted that Oscar stay with Catterson for a few days to help address the situation.

Oscar's next show was scheduled to take place in Ohio in June 2019. Emily and Dave hesitated to give their blessing for his attendance because they were concerned for his well-being. They eventually relented after Betsy suggested they transport Oscar and remain with him at the show. Shawne Imler, an AKC-registered professional dog handler and breeder from Maryland, handled Oscar because Catterson was unavailable.

According to Betsy, Emily and Dave refused to adhere to the handler's instructions during the show. For example, rather than allowing Oscar to rest in his crate alone as directed, the couple either sat by his crate and fed him or took him out for walks. In another instance, Emily was holding Oscar and Betsy was holding Sherman, Oscar's sire. The dogs acted aggressively toward each other, so Imler directed Emily to separate them. Rather than comply, Emily argued with Imler and told her it would be fine because the dogs knew each other.

Dave scheduled a meeting with Betsy in July 2019 to discuss Oscar's activities because of Betsy's increased use of the terms "campaign" and "guardian home." During the discussion, Betsy proposed campaigning Oscar alongside Imler which would have Oscar absent from their lives for several months at a time. The couple asserted that this idea was never previously mentioned and they were adamantly opposed to such a radical shift in Oscar's lifestyle, what they characterized as "suddenly [taking] him from a life where he has human interaction" to something entirely different. Their concern was heightened by the fact that Imler seemingly failed to properly care for her own dogs, an observation Betsy also independently made at one time.

Oscar's next show was scheduled for August 2019 in Colorado and Imler was once again slated to be his handler. Given what Betsy and Imler viewed as objectionable behavior on the part of Dave and Emily during the Ohio show, the two were not keen on the couple attending the Colorado event, so Betsy asked them not to go. According to Emily and Dave they only agreed to honor that request with the contingency that Betsy promptly return Oscar home after the show. Their assertions differed from Betsy's who testified that she discussed the breeding issue with Dave and Emily prior to the Colorado show and proposed a dog named Valkyrie as a suitable mate that was also in season. Betsy thought the best plan was to send Oscar to Maryland with Imler who could breed Oscar with Valkyrie before his next show in Kentucky. Then, Emily and Dave could pick Oscar up at the Kentucky show.

According to Dave, they never agreed upon breeding Oscar with Valkyrie. To the contrary, Dave recalled that when Betsy communicated that plan he responded with an irate phone call laced with profanity and threats coupled with a demand for Oscar to be returned immediately or he would pursue legal action.

Dave's call prompted Betsy to contact an attorney in Colorado who purportedly advised her to send Oscar to Maryland with Imler until she could reach a written agreement with Dave and Emily. Betsy informed the couple that she intended for them to remain a part of Oscar's life but, by the same token, it was time for Oscar to start campaigning for a grand championship. The conversation did not go well so Betsy terminated the discussion and informed the couple she was working with an attorney, so any other questions needed to be directed to Imler.

Emily and Dave were separated from Oscar for over a month. They were aware he continued to compete because they followed his show entries online. But they also noticed he was marked absent for several shows so they grew concerned and worried that Imler was not caring for him properly.

9

During the last week of September 2019, Dave decided to drive to Hampton, Virginia, to collect Oscar from a show. A friend of his entered the venue first to sleuth out Oscar's precise location and after doing so, Dave slipped in, took Oscar from his crate, and left. He called Imler about 20 minutes after he left to let her know the dog was safe. Oscar and Dave made it back to Kansas the following day and promptly visited their veterinarian. According to the veterinarian, Oscar had suffered noticeable weight loss, had a hot spot under his right ear, and was plagued with ear infections, hookworms, and hygromas on his elbows.

Betsy countered with evidence that Oscar was in good condition at the time of the Virginia show. Imler asserted that Oscar already had the hygromas when Emily and Dave brought him to her in June 2019. She claimed she reduced their size and had the hot spot on Oscar's head treated by a veterinarian before the Virginia show. Betsy also presented the testimony of an AKC judge from the Virginia show who claimed that Oscar was happy and "in beautiful shape" when she saw him. Her testimony was corroborated by a fellow Cane Corso competitor who testified that there were no indications Oscar suffered from improper care; rather, he was happy and appeared to be having a good time in Virginia.

At the conclusion of the hearing, the court issued a memorandum decision intended to resolve the merits of the underlying issue, that is, which party could properly claim ownership of Oscar, even though the purpose and scope of the hearing was to analyze Betsy's request for a preliminary injunction. The court found that the parties entered into an oral agreement regarding Oscar and that under the terms of that agreement Betsy had ownership rights to Oscar that afforded her unfettered latitude to determine the appropriate training for Oscar, as well as whether he should show or campaign. The court further found that Emily and Dave were simply intended to be a guardian home for Oscar during his show years and a retirement home afterward. However, because their removal of Oscar from the Virginia show adversely affected Betsy's interests and thereby

10

breached the parties' agreement, they forfeited their guardianship and retirement rights to Oscar. The court then held that any determination of whether Emily and Dave would act as Oscar's guardianship or retirement home going forward was a matter left solely to Betsy's discretion. Yet it then ordered that Emily and Dave "shall continue to be the retirement placement of Oscar once his show career is over." The court did not award Betsy any damages for the time she lost with Oscar as a result of the couple's purported breach.

Emily and Dave timely brought the matter to this court to analyze the propriety of the district court's order.

ANALYSIS

*The district court impermissibly exceeded the parameters of the preliminary injunction issue litigated by the parties to resolve the merits of the ultimate issue concerning Oscar's ownership and misapplied the common law rules of ownership in designating Betsy as Oscar's sole owner.*

Emily and Dave assert that the singular issue before the district court was Betsy's request for a preliminary injunction and they tailored their litigation accordingly. Thus, they were not afforded the opportunity to present evidence related to the ultimate issue of Oscar's ownership before the district court entered a decision on that matter, resulting in a violation of their right to due process.

Betsy urges us to not take up the couple's claim, contending that it was not properly preserved before the district court and cites the general rule that a constitutional claim cannot be raised for the first time on appeal. See *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Yet she does not provide us with any authority to buttress the proposition that a party must file a posttrial motion objecting to the district court's

11

consolidation of a preliminary injunction hearing with a trial on the merits to preserve the issue for appeal.

Not all claims that involve a constitutional issue require a party to object before the district court. For example, cases challenging the sufficiency of evidence involve a defendant's constitutionally guaranteed right to due process, yet a party need not advance a specific challenge to the sufficiency of the evidence before the district court to preserve it for appeal. See *State v. Baumgarner*, 59 Kan. App. 2d 330, 333-34, 481 P.3d 170 (2021); *State v. Farmer*, 285 Kan. 541, 545, 175 P.3d 221 (2008) (noting that the State cited "no authority for the specific proposition that a challenge to the sufficiency of the evidence before the district court is necessary to preserve it for appeal" and that there was "no requirement that a criminal defendant challenge the sufficiency of the evidence before the trial court in order to preserve it for appeal"). A defendant also need not make an objection in the district court to preserve a claim of prosecutorial error, which likewise implicates his or her due process rights to a fair trial. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Emily and Dave are challenging the district court's legal authority to issue a final order. That makes this case much like one involving a challenge to the sufficiency of the evidence. There is no statute, as there is with evidentiary objections, ordering a party to make a contemporaneous objection to preserve an issue of this nature for appeal. See K.S.A. 60-404. For these reasons, we reject Betsy's contention that review is foreclosed due to a lack of preservation. See *Paris v. U.S. Dept. of Housing and Urban Development*, 713 F.2d 1341, 1347 (7th Cir. 1983) (noting that appeal was "in effect, the plaintiffs' first opportunity to object to the Rule 65 consolidation").

As a secondary argument designed to erect a hurdle to Dave and Emily's pursuit of review, Betsy contends the merits of the issues were tried as a product of the collective consent of the parties. Specifically, she asserts that after the third day of evidence and in

response to the district court's inquiry, "the parties advised the district court they did not anticipate or need to present any further evidence on the issue of ownership or any of the other issues in the case and agreed that the court had all of the evidence and testimony needed to address these issues." She acknowledges that this conversation is not in the record, but she attached affidavits from her own trial attorneys as appendices to her brief on appeal in which they attest that such an exchange occurred. Emily and Dave do not confirm whether this conversation took place, and the record does not contain any affidavits from their attorneys.

We are prohibited from affording the appended documents any measure of consideration. "Material which is annexed to an appellate brief by way of an appendix is not a substitute for the record itself and cannot be considered on appeal." *In re Gershater*, 270 Kan. 620, 633, 17 P.3d 929 (2001). Kansas Supreme Court Rule 3.04 (2022 Kan. S. Ct. R. at 24) establishes a procedure for parties to follow when a transcript is unavailable, and Betsy failed to follow it. Accordingly, we will only consider the facts contained within the record and, as we will elaborate on later in this opinion, the record contains no indication that the district court gave the parties notice of its intent to consolidate the preliminary injunction hearing with a trial on the merits.

There are few cases in Kansas that address consolidation of a preliminary injunction hearing with a trial on the merits. The Kansas Supreme Court has recognized that at times a district court can consolidate a hearing on a motion for a preliminary injunction with a trial on the merits of an injunction action. *Omni Outdoor Advertising of Missouri, Inc. v. City of Topeka*, 241 Kan. 132, 138, 734 P.2d 1133 (1987). This constitutes a discretionary decision, so whether the district court erred in pursuing such a path is reviewed for an abuse of discretion. A judicial action constitutes an abuse of discretion if it is (1) arbitrary, fanciful, or unreasonable; (2) based on an error of law; or (3) based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018).

13

In *Omni*, Omni Outdoor Advertising brought an action for injunctive and declarative relief against the City of Topeka after it enacted an ordinance regulating billboards. Following a hearing on Omni's request for a preliminary injunction, the district court shifted gears and decided the action against Omni on the merits. Omni appealed, arguing that the district court denied it due process by deciding the case without a trial on the merits. 241 Kan. at 132.

Whether the district court could consolidate a hearing on a motion for a preliminary injunction with a trial on the merits was a question of first impression. The *Omni* court turned to the Federal Rules of Civil Procedure for guidance and noted they allowed for such consolidations. 241 Kan. at 135 (citing Fed. R. Civ. Proc. 65). It also highlighted the "general rule followed in a majority of the circuits":

> "'If a consolidation of a trial on the merits with a hearing on a motion for a preliminary injunction is to be ordered, *the parties should normally receive clear and unambiguous notice to that effect either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases.* A litigant applying for a preliminary injunction should seldom be required either to forego discovery in order to seek emergency relief, or to forego a prompt application for an injunction in order to prepare adequately for trial. Different standards of proof and of preparation may apply to the emergency hearing as opposed to the full trial.'" 241 Kan. at 137 (quoting *Pughsley v. 3750 Lake Shore Drive Cooperative Bldg.*, 463 F.2d 1055, 1057 [7th Cir. 1972]) (Emphasis added.)

Following this discussion, the court held that a district court can "consolidate a hearing on a motion for a temporary injunction with a trial on the merits of an injunction action, providing that no prejudice results to the parties." 241 Kan. at 138. In an effort to provide some measure of guidance the court added:

> "Factors to be considered include but are not limited to the parties' preparedness for trial, including the completion of or the need for additional discovery, the availability at the

14

hearing of evidence which either party proposes to introduce upon trial, the issues involved, and the adequacy of time which the parties have to prepare for the hearing. If the parties agree to consolidation, then with the court's consent consolidation may be ordered. If the parties do not agree, then the trial court must determine whether or not there is to be a consolidation. *If the court determines to consolidate, all parties must be given adequate, clear, and unambiguous notice of the consolidation.*" (Emphasis added.) 241 Kan. at 138.

In Omni's case, the court found that the district court provided no notice of its intention to consolidate the hearing and that Omni sustained actual prejudice as a result of the consolidation. 241 Kan. at 138. A compelling factor in the court's conclusion on prejudice was Omni's argument that "additional facts relevant to the legal issues would be sought through discovery, and would be presented at trial." 241 Kan. at 136. Omni listed several pieces of evidence it contended would have been disclosed by discovery and the court deemed that evidence relevant to Omni's substantive claims. 241 Kan. at 136.

In this case, there is similarly no evidence in the record that the district court provided the parties with the requisite notification of its intention to consolidate the preliminary injunction hearing with a trial on the merits. The notice of the hearing specified it was a preliminary injunction hearing. The parties' pretrial briefs outlined the standards governing proceedings for preliminary injunctions. No statements were uttered by the court at the outset of the hearing to clarify its intention to proceed with a resolution of the merits on the underlying issue of ownership. As the hearing got underway, Betsy presented her case first, consistent with her burden of proof as the party seeking a preliminary injunction. Thus, all indications were that the litigation was confined to Betsy's request for injunctive relief.

The downfall in going forward with less than transparent intentions is that it deprives both parties of the opportunity to thoroughly litigate the case in a manner that advances their respective interests. At the trial level, the burden of proof in an injunction

15

action is upon the movant. *U.S.D. No. 503 v. McKinney*, 236 Kan. 224, 227, 689 P.2d 860 (1984). In defining this burden, it has generally been held that a party seeking a temporary injunction must show: (1) a substantial likelihood of eventually prevailing on the merits; (2) a reasonable probability that the plaintiff will suffer irreparable injury without an injunction; (3) the lack of an adequate legal remedy, such as damages; (4) the threat of injury to the plaintiff outweighs whatever harm the injunction may cause the opposing party; and (5) the injunction will not be against the public interest. *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 619, 440 P.3d 461 (2019); *Wichita Wire, Inc. v. Lenox*, 11 Kan. App. 2d 459, 462, 726 P.2d 287 (1986). A temporary injunction preserves the relative positions of the parties until a full decision on the merits can be made. *Steffes v. City of Lawrence*, 284 Kan. 380, 394, 160 P.3d 843 (2007).

By contrast, a quiet title action places the burden on the movant to establish the strength of his or her own title rather than focus on the weakness of their adversary's title as one would for an injunction proceeding. See *Bucklin National Bank v. Hayse Ranch*, 58 Kan. App. 2d 715, 721, 475 P.3d 1 (2020); see also K.S.A. 60-1002. Contextually, this means that had the district court made Dave and Emily aware of the bifurcated nature of the hearing, they could have presented their evidence and arguments accordingly, revealing the weaknesses in Betsy's contentions while undergirding their own claims of ownership. But as it was, the district court's approach denied them the opportunity to advocate for their own interests.

Although a district court has broad latitude in exercising its discretion, that discretion is abused when the court renders a decision which disregards proper statutory limitations or legal standards. *State v. Ardry*, 295 Kan. 733, 736, 286 P.3d 207 (2012). That is precisely what occurred here when the court expanded the injunction proceedings in direct contravention of notice requirements, leaving Dave and Emily unaware of and unprepared for a trial intended to resolve the issue of Oscar's ownership.

Often this finding would mark the conclusion of our review of this matter, and we would remand the case to the district court to afford both parties the opportunity to present the evidence and obtain the corresponding analysis they were denied as a result of the district court's failure to provide the required notice. But because Betsy contends that she was aware that the injunction hearing encompassed the ultimate issue of ownership, we find she took the opportunity to present all the evidence she believed enabled the court to find in her favor which is then necessarily memorialized in the record before us. Our review of the proceedings further assures us that the degree of evidence put forth by Emily and Dave is enough to allow us to reach the propriety of the court's legal conclusion about Oscar's rightful ownership.

In reviewing the district court's ownership determination our role is not to substitute our judgment for that of the district court. Rather, we are tasked with the responsibility to review the district court's findings of fact and conclusions of law to determine whether the factual findings were supported by substantial competent evidence and whether they are enough to support its corresponding legal conclusions. See *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017).

This standard prohibits us from reweighing the evidence or making independent credibility findings; we must defer to the district court's assessment of conflicting evidence. *Gannon*, 305 Kan. at 881. We are also required to review the evidence presented at trial in the light most favorable to Betsy as the prevailing party. See *Unruh v. Purina Mills*, 289 Kan. 1185, 1195, 221 P.3d 1130 (2009). Even so, we exercise unlimited review in determining whether that evidence warrants the ultimate legal conclusions. *Gannon*, 305 Kan. at 881.

Following receipt of evidence and arguments from the parties, the court determined that Betsy successfully established herself as Oscar's rightful owner. It found

17

that Dave and Emily's interest was limited to that of a guardian home, and they lacked any authority to tell Betsy what she could or could not do with Oscar.

In offering a foundation for its ruling, the district court relied heavily on the relationship between the parties and the strong bond they once shared, which was more like family than merely a friendship. The nature of that bond prompted the court to conclude that there was no justification for a written agreement, despite the testimony from several witnesses with significant expertise in the dog show culture who asserted that the normal route under these circumstances is to enter into a written agreement to preserve the parties' respective interests.

The district court declined to find that the communications between the parties offered any measure of guidance about what they thought their interests were when Oscar went to live with Dave and Emily in 2017. It instead looked to Betsy's payment of all fees related to Oscar's show obligations as compelling evidence of ownership while Dave and Emily's financial commitment to Oscar's day-to-day existence and well-being were simply indicative of a guardian home. The court did acknowledge that Dave's name was listed as a co-owner alongside Betsy on Oscar's AKC registration but declined to assign any significance to the document. It instead found that such paperwork is only necessary to enable Oscar to enter shows and that AKC registration does not equate with ownership.

While there is substantial competent evidence in the record to generally support these factual findings, in that they were not manifested of whole cloth, they nevertheless fall short of providing adequate support for the court's conclusion that Oscar's ownership properly lies with Betsy. Again, we review de novo the legal pathway the district court traveled to arrive at its ownership determination and are under no obligation to follow in its footsteps. *Cady v. Schroll*, 298 Kan. 731, 734, 317 P.3d 90 (2014). A fair review of the record leads us to conclude that the district court erred, as a matter of law, through its

misapplication of the common law rules related to ownership of personal property. That flawed analytical framework yielded an erroneous result and, as such, its designation of Betsy as Oscar's sole rightful owner cannot be permitted to stand.

Both our judiciary and the Legislature have shared the view that dogs fall under the heading of personal property. See *State v. Rodriguez*, 269 Kan. 633, 634-35, 8 P.3d 712 (2000) (viewing dog as personal property for purposes of arson conviction in violation of K.S.A. 21-3718[a][1] which requires knowing damage by means of fire "any . . . property in which another person has any interest without the consent of such other person"); *State v. Fenske*, 144 Kan. 560, 562, 61 P.2d 1368 (1936) (A dog is personal property and thus may properly be the subject of a larceny.); *Burgess v. Shampooch Pet Industries, Inc.*, 35 Kan. App. 2d 458, 463, 131 P.3d 1248 (2006) (The district court properly found that a dog is personal property in determining the measure of damages.).

Issues about personal property are resolved through the application of rules and concepts found in the common law. In *State v. Livengood*, No. 122,241, 2021 WL 2388403 (Kan. App. 2021) (unpublished opinion), a panel of this court was tasked with delving into such concepts to resolve who claimed rightful ownership to Hudson, a dog that had purportedly been thieved. Livengood testified in his own defense and told the jurors he bought Hudson, never made a gift of Hudson to his girlfriend, Dechant, and considered himself to be Hudson's owner. Dechant testified to her continuous possession of Hudson but never expressly characterized the dog as a gift from Livengood. The jury convicted Livengood of both charges.

Livengood appealed and argued the State presented insufficient evidence that Dechant owned Hudson when the theft occurred. In rejecting that contention this court started with the "general proposition, [that] continuous and undisputed possession of personal property may be indicative of ownership. 2021 WL 2388403, at *2, citing *Alexander v. Logan*, 65 Kan. 505, 510, 70 P. 339 (1902) ("The possession of personal

property is some evidence of ownership."); *Willcox v. Stroup*, 467 F.3d 409, 412-13 (4th Cir. 2006); 29 Am. Jur. 2d, Evidence § 284.

In attempting to identify the rightful owner of papers from two gubernatorial administrations, the Fourth Circuit reiterated in *Willcox* that the common law has long recognized that "actual possession is, prima facie, evidence of a legal title in the possessor." 467 F.3d at 412, quoting William Blackstone, 2 Commentaries, *196. See, e.g., Edward Coke, 1 Commentary upon Littleton 6.b. (19th ed. 1832) (strong presumption of ownership created by "continuall and quiet possession"); *Bradshaw v. Ashley*, 180 U.S. 59, 63, 21 S. Ct. 297, 45 L. Ed. 423 (1901) ("If there be no evidence to the contrary, proof of possession, at least under a color of right, is sufficient proof of title."); Oliver Wendell Holmes, The Common Law 241 (1881) ("The consequences attached to possession are substantially those attached to ownership, subject to the question of the continuance of possessory rights . . . ."). The *Willcox* court then observed that the presumption arising from possession spans the spectrum of personal property. 467 F.3d at 413 (citing *Hammond v. Halsey*, 287 S.C. 46, 49, 336 S.E.2d 495 [Ct. App. 1985] [ownership of canon]; *Clanton's Auto Auction Sales, Inc. v. Harvin*, 238 S.C. 352, 357, 120 S.E.2d 237 [1961] [ownership of automobile]).

Notable for our purposes, the *Willcox* court also cited *Nesbitt v. Lewis*, 335 S.C. 441, 446, 517 S.E.2d 11 (Ct. App. 1999), which involved the determination of ownership for establishing liability following a dog attack. The court ultimately found the homeowner where the attack occurred had the requisite possession and control of the dogs to be held accountable, as did her live-in brother, because he "tended the dogs, taking them to the veterinarian, feeding them, and playing with them on occasion." 335 S.C. at 446.

Turning to the facts before us, we first analyze the matter of Oscar's AKC registration. Betsy completed the necessary paperwork which identifies her and Dave as

Oscar's co-owners and provides Dave's address for the required residence. Betsy has failed to put forth anything that shows this action to be ambiguous and so it is properly viewed as evidence of the parties' intent to communicate they share a mutual interest in Oscar.

Kennel Club registrations may provide presumptive evidence of ownership but are rarely dispositive. See *Buczkowicz v. Lubin*, 80 Ill. App. 3d 200, 202-03, 399 N.E.2d 680 (1980); *Dubin v. Pelletier*, No. WC 10-0825, 2012 WL 5983184 (R.I. Super. Ct. 2012) (unpublished opinion). Contrasted with other highly regulated forms of personal property such as motor vehicles or branded livestock, the law typically does not require similarly formal measures to pass title to domestic companion animals. In any event, that presumption of ownership may be overcome through clear and convincing evidence of a contradictory claim. See *Dufresne v. Cooper*, 64 R.I. 120, 11 A.2d 3 (1940). Ownership may be inferred from a calculus of each identifiable aspect of companion animal care such as housing, feeding, grooming, training, exercise, and tending to the animal's health through a significant devotion of one's time and financial resources. The circumstances existing at the time of the inquiry must be examined, and the actions, attitudes, and understanding of the suggested owner or owners must be considered, including sharing in the burdens and the benefits of the dog and holding themselves out to the world as its owner. *Pippin v. Fink*, 350 N.J. Super. 270, 274, 794 A.2d 893 (2002). Evidence pertinent to establishing ownership may include ownership of the mother, certification of registration, exclusive possession, or the exercise of control. See, e.g., *Jones v. Office of Finance of Baltimore County*, 294 Md. 601, 604, 451 A.2d 926 (1982) (noting that "offspring or increase of tame or domestic animals belongs to the owner of the dam or mother"); *Buczkowicz*, 80 Ill. App. 3d at 202 (considering the payment of stud fees as evidence of ownership); *Beard v. Mossman*, 144 Pa. Super. 508, 510, 19 A.2d 850 (1941) (reasoning that one-year possession of a dog was presumptive evidence of ownership).

The AKC registration places the parties on equal footing as to Oscar, but it is not dispositive proof of ownership, so our next step is to conduct an assessment of the other factors each party brought before the court. Betsy and Dennis needed to relocate their dogs because of Dennis' terminal illness and deteriorating condition. Emily and Dave welcomed Oscar into their home in October 2017 and it was the only placement arrangement Betsy made during that process which was not accompanied by a written contract. In exchange for receiving Oscar, Emily and Dave simply agreed to keep the dog intact so he would remain eligible for showing and breeding should Betsy opt to resume her hobby. Three months later Betsy filed Oscar's AKC registration and soon after, she gradually exposed Oscar to the show world. Oscar's initial limited exposure to that lifestyle was consistent with what Emily and Dave understood Oscar's potential show career might look like if Betsy opted to pursue one. But his participation quickly intensified in the wake of demonstrated success and, over the span of the next two years, Oscar competed in various locations, sometimes joining Betsy for extended periods of time. Oscar otherwise lived at home with Emily and Dave and often accompanied Dave to work. The couple provided for Oscar's day-to-day care including meals, exercise, and veterinary care. The latter of which was all the more critical because Oscar often returned home from shows with various health issues. Once in particular they covered the cost of a surgery that was necessary because Oscar ate a chew toy while in the custody of his handler, Catterson. When Oscar was absent from the home to participate in shows, Emily and Dave initially often traveled to those venues to support him. Thus, it is without question that Emily and Dave shared in the benefits and burdens accompanying a life with Oscar and held themselves out as his owners.

The role Oscar played in Betsy's life reflected the means to her desired end of achieving success and notoriety in the dog show arena. That is, he is important to her in a distinctly different, though no less meaningful, way than he is to Emily and Dave. In furtherance of her goals, Betsy bore the financial responsibility for Oscar's training, handling, and show enlistments. She also spent considerable periods of time with him

22

along with those events then returned him home to Emily and Dave afterward where he remained until the next scheduled event. She too embraced the blessing and the bane of owning Oscar. To be sure, neither party ever disputed that the other possessed an identifiable interest in Oscar. They simply parted ways in their respective perceptions of the scope of the other's interest and who enjoyed a superior interest in the eyes of the law.

A return to *Willcox* is imperative at this point for its recognition that the presumption of ownership "will not always cut in one direction." 467 F.3d at 414. Rather, instances of dual interest will arise, where one entity reveals ownership while another puts forth compelling evidence to rebut that presumption. 467 F.3d at 414. The preceding summary reflects a significant overlap about the parties' interests in and relationship with Oscar. Both parties nurture and care for Oscar in ways that are necessary to satisfy their respective goals and derive corresponding benefits from their considerable efforts. Not only was Oscar a delightful addition to Emily and Dave's family, but he also proved successful in the show ring. Thus, consistent with common law rules governing ownership, neither party enjoys a greater right of possession than the other. This case is illustrative of the concept of co-ownership identified by *Willcox*.

Unfortunately, because of its misapplication of the governing legal principles, the district court either did not recognize or failed to appreciate the existence of that co-ownership. Its failure to do so requires that we reverse its finding that Betsy enjoys solitary, full, and unfettered ownership of Oscar and remand the case back with the directive that Dave's rights as a co-owner be enforced. Accordingly, any decisions about Oscar's showing or breeding must be made collectively between the owners and once that show career concludes and he is no longer a viable candidate for breeding, Oscar shall enjoy retirement with Dave and Emily.

Reversed and remanded with directions.