**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-2246**

———————

WILLIAM NILE ELAM, III,

       Plaintiff - Appellee,

v.

STEPHEN TIMOTHY EARLY; MICHAEL S. EARLY; SUZANNE J. EARLY,

       Defendants - Appellants.

———————

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Michael Stefan Nachmanoff, District Judge. (1:23-cv-00229-MSN-WEF)

———————

Argued:  December 12, 2024                          Decided:  May 30, 2025

———————

Before HARRIS, RICHARDSON, and QUATTLEBAUM, Circuit Judges.

———————

Affirmed by published opinion. Judge Quattlebaum wrote the opinion, in which Judge Harris joined. Judge Richardson wrote a dissenting opinion.

———————

**ARGUED:**  Robert E. Goldman, LAW OFFICES OF ROBERT E. GOLDMAN LLC, Allentown, Pennsylvania, for Appellants.  Philip J. Harvey, HARVEY LAW OFFICES, PLLC, Alexandria, Virginia, for Appellee. **ON BRIEF:**  Paris R. Sorrell, HARVEY LAW OFFICES, PLLC, Alexandria, Virginia; David G. Fiske, FISKE LAW GROUP, PLLC, Alexandria, Virginia, for Appellee.

———————

QUATTLEBAUM, Circuit Judge:

This appeal involves the intersection of two time-tested traditions. One, sadly, is that families sometimes squabble over their ancestors' possessions. Going back at least to the Book of Genesis—where Jacob took advantage of his older brother Esau to gain his birthright—family fights over inheritance are "a tale as old as time."[1] Carrying on that unfortunate legacy, William Elam and his relatives—the Earlys—cannot agree who owns a set of Norman Rockwell drawings given to their grandfather. Elam says he owns them outright, while the Earlys insist they are part-owners.

The other tradition is really an adage. As many of us heard growing up, "possession is nine-tenths of the law." It turns out that this old saying reflects our law's acknowledgment that possession is often the best evidence of ownership. In adopting that presumption, Virginia law, which controls this case, follows principles that date back to ancient Rome. And here, the district court found that Elam's possession of the Rockwells created a presumption of ownership, which the Earlys did not rebut.

Applying this ancient solution to a more ancient problem, we agree that Elam's possession entitled him to a presumption that he owned the art. We also agree that the Earlys did not rebut that presumption. Rather than establishing their own superior title, as the law requires, they merely tried to poke holes in Elam's title. We, therefore, affirm the district court's order of summary judgment declaring Elam to be the owner of the drawings.

---

[1] *"Beauty and the Beast,"* written by Howard Ashman & Alan Menken, in *Beauty and the Beast* (Walt Disney Animation Studios 1991).

2

## I. Background

### A. Facts

Our story begins during the Franklin D. Roosevelt administration. In 1943, famed artist Norman Rockwell[2] drew four panels capturing various visitors in the West Wing waiting for an audience with FDR. That same year, Rockwell gifted the four original illustrations—entitled *So You Want to See the President*—to FDR's Press Secretary, Stephen T. Early. The illustrations are pictured below:

---

[2] "Without thinking too much about it in specific terms, I was showing the America I knew and observed to others who might not have noticed." —Norman Rockwell, Norman Rockwell Museum, NORMAN ROCKWELL: A BRIEF BIOGRAPHY, https://www.nrm.org/about/about-2/about-norman-rockwell/ [https://perma.cc/Z9DP-JMDV] (last visited Feb. 18, 2025).

Born in New York City in 1894, Norman Rockwell is one of America's great artists. At the age of 22, he painted his first cover for the Saturday Evening Post, which he called "the greatest show window in America." He would go on to create 321 more covers for the Post over the next 47 years. Inspired by FDR's 1943 address to Congress, Rockwell painted four pictures celebrating fundamental American freedoms that toured the U.S.A. raising money for the war effort: Freedom of Speech, Freedom to Worship, Freedom from Want, and Freedom from Fear. In 1977, the year before he died, he received the Presidential Medal of Freedom.



J.A. 52.

Unheard of by today's standards, Early was the longest-serving press secretary in our nation's history, holding the role for twelve years under President Franklin D. Roosevelt. Roughly eight decades later, his relatives are fighting over this art.

Some family history will provide useful background for the squabble. Stephen T. Early—Grandfather Early—married Helen Wrenn Early—Grandmother Early. Together they had three children—Stephen T. Early, Jr., Thomas A. Early and Helen Early Elam. All three children have died. Stephen Jr. and his wife Suzanne had a daughter named Andrea DeLeon. Thomas had three children—Stephen Timothy Early, Michael Early and Thomas A. Early, II. And Helen had two children—Dru Anne Elam and William Elam, III. For a visual picture, the record contains this family tree:

4



J.A. 781.

With that family history in mind, we turn to the dispute that led to this appeal. Elam claims that Grandfather Early gifted the illustrations to his mother Helen when she graduated from college in 1949. The two other branches of the family—Stephen Jr.'s widow, Suzanne, and two of Thomas' sons—Stephen and Michael—dispute this. They point out that there is no documentary evidence of this gift.

The parties agree that Helen didn't take immediate possession of the drawings. In 1949, the same year she graduated, Helen got married. At some point, she and her husband moved to St. Louis. But the illustrations remained behind in the Grandparents' house on Morningside Drive in Washington, D.C.

In 1951, Grandfather Early died. He did not leave a will, so his possessions passed to his heirs under the law, Grandmother Early and their three children—Stephen Jr., Thomas and Helen. The probate court records include a meticulous accounting of

5

Grandfather Early's estate. It details items such as a $4 lighter, a $2 table radio, and a $4 fishing pole. But even though his friends and family knew that Grandfather Early was as proud of the Rockwells "as Churchill was of the [Royal Air Force]," the accounting did not mention the Rockwells. J.A. 35.

Grandmother Early signed the accounting, stating that it was "a true and perfect Inventory of the Goods, Chattels, and Personal Estate of [Grandfather Early]," that she would add any further items to an additional inventory as needed and that she knew of no concealment of any part of Grandfather's estate. J.A. 195. Helen and Thomas each signed receipts acknowledging their distributions from Grandfather Early's estate. Stephen Jr. did not sign his, but he did not object to the list.

In 1956, Grandmother Early moved to a house on Tulane Drive in Alexandria, Virginia. The parties agree she took the Rockwells to her new house, where they remained until at least 1960.

The parties disagree about what happened in 1960. According to Elam, Helen—who had returned to the D.C. area from St. Louis—took the illustrations to her house on Marlan Drive in Alexandria. As he tells it, this was the first house of Helen's that was large enough to display the Rockwells. When Helen divorced in 1968, she moved in with Grandmother Early, who had since moved from her home on Tulane Drive to one on Hoover Lane. Elam says Helen brought the illustrations with her.

The Earlys tell a different story. In their version, the illustrations stayed in Grandmother Early's house on Tulane Drive—which she moved to in 1956—until 1969. That year, mildew problems forced her to move the illustrations to Helen's home on Marlan

6

Drive. Grandmother Early then bought the Hoover Lane house. Shortly afterward, Helen came to live there and brought the Rockwells, which, according to the Earlys, she had been temporarily storing to avoid mildew.

The parties agree that from 1969 to 1972, Helen and Grandmother Early, along with the Rockwells, lived at Grandmother Early's house on Hoover Lane. They also agree that in 1972, Grandmother Early suffered a stroke, after which she moved to an assisted living community. And no one disputes that Helen continued to live at the house on Hoover Lane, and that the illustrations remained there too.

In 1978, there was an attempted break-in at the Hoover Lane house. Worried about the illustrations, Helen thought loaning them to the White House would keep the pieces safe. Helen ran the idea by her brother Stephen Jr., who approved. So, the illustrations went to the White House in 1978 under an agreement that was officially between her son, William Elam, and the White House. It obligated the White House to return the illustrations to Elam upon request.

That same year, Grandmother Early died. The accounting of her estate does not list the illustrations or any partial interest in them. Nor does Grandmother Early's will or codicil. And Grandmother's estate attorney testified that when he toured her house to get a sense of her estate, he saw the illustrations, but Grandmother Early never mentioned that she owned them.

Grandmother Early's will does not have much detail. But it does bequeath her "personal effects, household furnishings and objects of art to my three children." J.A. 209.

7

Despite that, her estate inventory valued all her household furniture and personal effects at only $3,000. The illustrations were appraised in 1979 at $80,000.

The three children—Stephen Jr., Thomas and Helen—each signed acknowledgments stating they received a one-third share in "personal effects and household furnishings" in "full settlement of my share of the estate of" Grandmother. J.A. 203–05. None of them mention the illustrations.

Stephen Jr. died in 2009. His estate documents do not mention an ownership interest in the illustrations.

Helen died in 2009 as well. Her will expressly bequeathed two Rockwell panels to William Elam and two to Dru Anne. Later, Dru Anne disclaimed her ownership in the illustrations, giving William Elam 100% of Helen's interest in the illustrations.[3]

In 2017, Thomas—who claims he did not know that the illustrations were in the White House—saw them in the background of an interview with President Trump he was watching on TV. At that point, he and his daughter-in-law separately contacted the White House to object to the loan. But when he died in 2020, Thomas' estate documents, like Stephen Jr.'s, did not say anything about the illustrations.

In 2021, the dispute came to a head. At that point, Stephen Jr.'s widow, Suzanne, and Thomas' sons, Stephen and Michael, notified Elam that they claimed an ownership

---

[3] Adding to the family drama, the Earlys insist this contract was the product of fraud. They say that William Elam's sister, Dru Anne, never read the contract that she signed. But Dru Anne is not a party to this lawsuit, and the Earlys lack standing to bring a claim of fraud on her behalf. So, whether true or not, these allegations are not relevant to our decision.

interest in the illustrations. The next year, Elam asked the White House to return the illustrations. While Elam has had them since that return, the parties agree that his possession since then cannot be used to demonstrate ownership.

**B. Procedural History**

In 2023, Elam sued all his family members who claimed an ownership interest in the illustrations—Stephen Early, Michael Early and Suzanne Early. Elam asked the court to quiet title to the Rockwells and issue a declaratory judgment that he owns them. The Earlys countersued, likewise asking the court to quiet title and render a declaratory judgment in their favor. They also brought counterclaims under Virginia common law for conversion, detinue,[4] breach of bailment, conspiracy, fraudulent concealment, fraud and unjust enrichment. They abandoned these last three claims before both sides moved for summary judgment.

The district court granted Elam's motion and denied the Earlys'. First, regarding Elam's claims for quiet title and declaratory relief, the court reasoned that Elam was entitled to a common-law presumption of ownership due to Helen's possession of the paintings from 1960 to 1978. This shifted the burden to the Earlys to show superior title. The Earlys' primary argument was that Grandfather Early never gave a valid inter vivos gift to Helen, so Helen had no more than a 1/3 share to give to her children. The court

---

[4] One does not see detinue actions every day. "The object of a detinue action is to recover specific personal property and damages for its detention." *Broad Street Auto Sales, Inc. v. Baxter*, 334 S.E.2d 293, 294 (Va. 1985). "The action is employed to recover a chattel from one in possession who unlawfully detains it from either the true owner or one lawfully entitled to its possession." *Id.*

9

acknowledged it is undisputed that the illustrations were not physically delivered to Helen during Grandfather Early's lifetime. But it also determined that since the Earlys had the burden to prove superior title, a mere lack of evidence of the inter vivos gift's validity was insufficient.

The district court next explained that the evidence in the record shows Elam has superior title. The court highlighted that of all the family members, the only estate to specifically reference the illustrations is Helen's. From this, the court said, one can "only conclude that the [i]llustrations were not a part of Grandfather Early's estate because he had already gifted them during his lifetime." J.A. 769.

As to the Earlys' common law counterclaims, the court determined that the conversion claim was time-barred. And it would fail on the merits, anyway, the court said, because conversion cannot lie against a person who has a partial ownership interest in an indivisible object. This same reason barred the Earlys' detinue claim. The court then determined no admissible evidence supported the Earlys' bailment claim. With no surviving common law claims, the court dispensed with the conspiracy claim, granting Elam summary judgment in full. This appeal followed.[5]

---

[5] Because Elam is a citizen of Virginia while the Earlys are citizens of North Carolina and Maryland, the district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1). The Earlys timely appealed the district court's November 1, 2023, decision granting Elam's motion for summary judgment on November 27, 2023. We thus have jurisdiction under 28 U.S.C. § 1291.

And because Elam brought this suit in Virginia, we apply Virginia substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996) ("Under [*Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)], federal courts sitting in diversity apply state substantive law and federal procedural law.").

## II. Analysis

The Earlys' primary argument is that the district court erred in its quiet title analysis. "[I]n a quiet title action, a plaintiff asks the court to declare that he has good title to the property in question and compels any adverse claimant to prove a competing ownership claim or forever be barred from asserting it." *State of Maine v. Adams*, 672 S.E.2d 862, 866 (Va. 2009). The Earlys argue that during its quiet title analysis the district court improperly applied Virginia's common law presumption of ownership. They do not dispute that Virginia generally presumes that possession indicates ownership. But they insist that we should consider this presumption only after assessing the validity of the alleged gift from Grandfather Early to Helen. To address these arguments, we begin with some background on the principle that possession of property creates a presumption of ownership. We then consider the Earlys' sequencing argument before applying the presumption of ownership to the evidence in this record. Last, we will review the district court's decisions as to the Earlys' common law counterclaims.

### A. The Presumption

The importance Virginia law places on the possession of property in determining ownership is nothing new. In fact, it dates all the way back to Roman law. The Romans had a legal doctrine called "as you possess," by which the praetor declared, "I forbid force to be used to prevent him of you two who is at present in a faultless possession of the

11

disputed building from possessing it as he at present does."[6] Eric Descheemaeker, *The Consequences of Possession* 21 (U. Edinburgh Sch. of L., Working Paper No. 2013/31, 2013) (quoting Fritz Schulz, *Classical Roman Law* 448 (1951)).

By Justinian's time (482–565 A.D.), this doctrine was extended to chattels. *Id.* at 22. In this way, "[t]he Romans resolved pragmatically what could have otherwise become analytically insoluble questions about possession." *Id.* at 20.[7]

The law's premium on possession continued into the Middle Ages. "So feeble and precarious was property without possession . . . in the eyes of medieval lawyers that [p]ossession largely usurped not only the substance but the name of Property." Frederick Pollock & Robert Samuel Wright, *An Essay on Possession in the Common Law* 5 (1888).

Early American law continued this tradition. As early as 1822, the Supreme Court of the United States held that "if a person be found in possession . . . it is *prima facie* evidence of his ownership." *Ricard v. Williams,* 20 U.S. (7 Wheat.) 59, 105 (1822).

---

[6] *See* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2302273 [https://perma.cc/39XT-8Z4N].

[7] Our friend in dissent claims our reference to Roman law is an effort to "lend an air of legitimacy" to our application of the presumption at the summary judgment stage of the case. Diss. Op. at 25. Not so. Our reference to Roman law is to show the historical pedigree of the presumption that Virginia law maintains to this day, something we seem to all acknowledge. We part ways, however, on the implications of the dissent's statement that during Roman times, factfinders applied the presumption. We do not look to history to replicate the precise procedures used centuries ago. Instead, we must apply the presumption based on Virginia law and the Federal Rules of Civil Procedure, even if the Romans did not apply it the exact same way. So, the result here does not depend on evidence of Hammurabi or a Roman praetor pulling out an ancient equivalent of Rule 56.

12

The presumption gathered no dust in Virginia. *See Tate v. Tate*, 7 S.E. 352, 356 (Va. 1888); *Smith v. Bailey*, 127 S.E. 89, 95 (Va. 1925). To the contrary, the Virginia Court of Appeals applied the presumption dispositively just a few months ago. *See Cowherd v. City of Richmond*, 905 S.E.2d 463, 467–68 (Va. Ct. App. 2024) (holding that maintaining a monument site for over 100 years entitled the city to a presumption of ownership). And in *State of Maine v. Adams*, 672 S.E.2d 862 (Va. 2009), the Virginia Supreme Court thoroughly examined the presumption. The court explained that Virginia law recognizes that "[p]ossession of personal property is presumptive proof of ownership because individuals generally own the personal property that they possess." *Id*. at 867. This presumption persists "until a better title is proven." *Id*. But if no better title is shown, the presumption "prevails and relieves a court from having to preside over 'a historical goose chase.'" *Id*. (quoting *Willcox v. Stroup,* 467 F.3d 409, 413 (4th Cir. 2006)). There, the Virginia Supreme Court applied the presumption dispositively to an action to quiet title to a copy of the Declaration of Independence. Indeed, because the possessor was entitled to the presumption, the court did not reach the question of whether the possessor was a bona fide purchaser, since the non-possessor "failed to prove under any theory that [it] owned the print or had superior title." *Id*. at 869.

We have embraced this presumption ourselves. In *Willcox*, we explained its theoretical justifications and utility, recognizing that "the presumption operates to resolve otherwise impenetrable difficulties." 467 F.3d at 413. When a case presents questions about ownership to which the answers might otherwise prove a mystery, the presumption "cuts

13

the Gordian knot." *Id.* The presumption also, we noted, "promotes stability" by deferring to "settled distributions and expectations." *Id.*

There, we applied the presumption to South Carolina's claim that papers from two governors of South Carolina during the Civil War were public property. Willcox had found the papers in 1999 or 2000 in a closet in his late stepmother's home. *Id.* at 411. The papers seemed to come into Willcox's family through his great-great-uncle, a Confederate major general named Evander Law. *Id*. By the 1940s, General Law's granddaughter (Willcox's stepmother) Annie Storm was in possession of the papers. Storm described the documents as "original State House papers entrusted to [her] grandfather at the time of the surrender." *Id.* Then, shortly before the documents were supposed to be auctioned in 2004, Willcox gave them to the South Carolina State Archives so they could microfilm them. *Id.* The day before the auction, South Carolina obtained a temporary restraining order enjoining the letters' sale and asserting its claim to the letters as public documents. *Id*. We held that Willcox established the presumption of possession over the many years he possessed the property, and South Carolina had no basis for rebuttal. *Id*. at 417. Thus, Willcox had superior title.

Does presuming ownership from possession work perfectly every time? Of course not. Even with the opportunity for rebuttal, the presumption may at times be overinclusive and entitle some possessors to property they don't own. But our tradition, across millennia, has decided that overinclusion is preferable to the insecurity of a world where the law does not assume that people own the property they possess. We will not disregard this

14

longstanding tradition in Virginia law.[8] Thus, we agree with the district court that the presumption applies to the contest over who owns the Rockwells.

### B. The Earlys' Sequencing Argument

The Earlys do not dispute that Virginia law presumes possessors of property are the owners. Instead, they argue that we should consider this presumption only after evaluating whether the gift from Grandfather Early to Helen was valid. And they insist that it was not. Citing District of Columbia law, where Grandfather Early lived at the time of the supposed gift to Helen, they say Elam must prove by clear and convincing evidence that Grandfather intended to give the Rockwells as a gift and delivered them. *See Murray v. Gadsden*, 197 F.2d 194, 205 (D.C. Cir. 1952) ("The requisites of a valid gift inter vivos are delivery,

---

[8] Also, nothing in Virginia law suggests the presumption does not apply to co-owned property. To the contrary, the presumption "applies across the law of personal property." *Willcox*, 467 F.3d at 413. While a couple of older decisions from other states address the concept of co-ownership, even they do not suggest a broad exception for co-owned property. Take *Ryhiner v. Feickert*, 92 Ill. 305, 312 (1879). That case put no weight on the presumption of possession for a note that was payable on its face to two different people. As the court said, "[t]he faces of these notes disclose the interest of the holder—that he is joint payee, and that therefore he holds for himself and for all the other payees—and rebut any presumption that might arise otherwise from the mere possession of the notes." *Id.* The court did not say the presumption didn't apply; it said the face of the note rebutted the presumption. *Turley v. Tucker*, 6 Mo. 583 (1840) is no different. There, a sawmill sued another nearby sawmill for sawing trees the first sawmill had felled. But the trees the sawmill cut were on land owned by the United States. Thus, "the very evidence which establishes the possession proves also that possession to be tortious, and consequently the plaintiff's possession being only *prima facie* evidence of property, is rebutted by establishing a conflicting claim to an absolute property in another." *Id.* at 587. Like *Ryhiner*, *Turley* does not say that the presumption doesn't apply. Rather, it was rebutted by evidence. And imagine the consequences if the presumption did not apply in the case of a claim of co-ownership. It would be bizarre to be able to defeat the presumption in any case simply by claiming joint ownership.

15

intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift.").

For at least three reasons, the district court correctly rejected this argument. First, the very word "*pre*sumption" indicates a step that occurs *before* further analysis. Second, the presumption would not fulfill its purpose of relieving the court from "wild goose chase[s]" if the court chased the goose *before* applying the presumption. *See Willcox*, 467 at 413. Under the Earlys' approach, the presumption would be hollow. If Elam must first prove a valid inter vivos gift, but cannot, the case would be over. There would be no role for the presumption. Likewise, at least in this case, even if Elam had to first prove a valid inter vivos gift and could do so, there would still be no role for the presumption. On the other hand, starting with the presumption gives meaning to each step of the analysis. Third, nothing in Virginia law suggests the Earlys' proposed sequencing is correct. Precedent applies the presumption first and shifts the burden to the non-possessor to show superior title. Following that approach, we turn now to whether Helen was entitled to the presumption.

### C. Helen's Possession

The parties agree that the Rockwells were at the Grandparents' house on Morningside Drive in Washington, D.C. from 1943 to 1956. They also agree that the illustrations were at Grandmother Early's house on Tulane Drive from 1956 until at least 1960. Elam's sworn testimony in the record indicates that Helen possessed the illustrations beginning in 1960. Also, Helen wrote a letter to the Rockwell Museum stating that she was given the Rockwells in 1960, which is the same year she and her husband moved into the

16

Marlan Drive house. And even if that evidence is thin, there is no dispute that Helen moved from her house on Marlan Drive to Grandmother Early's house on Hoover Lane in 1969 and brought the illustrations with her.

To be sure, the Earlys argue that Helen did not take possession of the Rockwells in 1960. They furthermore assert that any control Helen had over the Rockwells in 1969 was only because the family had agreed to move them to Helen's house temporarily because of moisture issues at Grandmother Early's house. But the only evidence for the Earlys' contrary story is Michael's testimony of what he remembers from a family meeting in 1969, when he was seven years old. Michael first answered "no" to the question of "can you testify as to what you heard, if anything, when you were age seven at that meeting?" J.A. 518. He then testified that, although he was just seven at the time, he remembered family members discussed moving the pictures to Helen's house because of moisture issues in Grandmother's home on Tulane Drive—Helen kept telling Grandmother that the Rockwells were going to get ruined.

The district court determined that this testimony was hearsay, which is inadmissible for summary judgment purposes. *Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan, J., concurring in part) (citing Fed. R. Civ. P. 56 (c)) ("A nonmoving party seeking to prevent summary judgment must show a genuine dispute of fact using admissible evidence, not merely conclusory or speculative statements."). The Earlys maintain that Helen's concern that the Rockwells would get ruined should be excepted from hearsay because it reveals Helen's state of mind. Maybe it does. But Helen's state of mind is not a

17

material issue; only the location of the pictures is. So, the Earlys cannot use what Michael heard others say to create a genuine dispute of material fact about the Rockwells' location.

Besides, as the district court noted, "at a minimum," Helen possessed the pictures from 1972 until 1978. J.A. 765. "Actual possession" is defined as "[p]hysical . . . control over property." *United States v. Moye*, 454 F.3d 390, 395 (4th Cir. 2006) (citing *Actual Possession*, Black's Law Dictionary 1201 (8th ed. 2004)). Actual possession requires "direct physical control." *Henderson v. United States*, 575 U.S. 622, 626 (2015). Grandmother left the house in 1972, never to return. For six years, Helen had undisputed sole physical control over the Rockwells. Thus, Helen had actual possession of the paintings during this period. And for good reason, the Earlys do not argue that the White House loan deprived Helen of possession. Thus, there is no genuine dispute of material fact that Helen alone possessed the Rockwells for years. As a result, she is entitled to the presumption of possession.

### D. Rebutting the Presumption

Having determined the presumption applies, we turn now to the Earlys' chance to rebut it. "If the party not in possession is able to produce [] evidence of superior title, the presumption of ownership in the possessor is defeated." *State of Maine*, 672 S.E.2d at 867 (citing *Willcox*, 467 F.3d at 413). "In most cases, the party not in possession would attempt to meet its burden through factual evidence, such as evidence of title or of recent prior possession." *Willcox*, 467 F.3d at 414. "[T]he [non-possessor's] burden may not be met by challenging the sufficiency of the possessor's title but only by proving the superior strength of its claim." *Id.* at 415.

18

But in their briefs, the Earlys do not attempt to show superior title. Instead, they rely exclusively on the lack of evidence for an inter vivos gift. In other words, they argued the presumption should not apply; they did not attempt to rebut it.[9] Having spent all their powder on that skirmish, the Earlys preserved no ammunition to wage a battle over superior title.

At oral argument the Earlys attempted to argue there was evidence that they had superior title. They insisted, for the first time, that intestacy laws evidence their superior title; that when Grandfather died intestate, one-third ownership in the Rockwells passed to Grandmother Early and two-thirds passed to Stephen Jr., Thomas and Helen. Then, at Grandmother Early's death, her one-third passed equally to the three of them. Thus, the Earlys insist they do more than just attack Elam's title; they claim this creates a genuine dispute of material fact about title.

There are two basic problems here. First, the Earlys did not advance this rebuttal argument in their briefs. They put all their eggs in the inter vivos gift basket. Confirming this, at oral argument, when asked where in their brief they had argued that they could rebut the presumption, the Earlys pointed to the fact section. But facts are not argument. *See*

---

[9] The Earlys' brief does contain a section titled "The Rebuttable Presumption Given to the Possessor." Op. Br. at 29. But that section does not rebut the presumption with evidence of superior title. This excerpt sums up the Earlys' argument from that part of their brief: "The court ignored the fact that it was Appellee's burden to prove the gift by clear and convincing evidence under D.C. law. And, equally significant, Appellants set forth a plethora of material facts, including the Appellee's admissions that establish that there was no *inter vivos* gift. Therefore, any presumption of sole ownership by Appellee's mother has been rebutted." Op. Br. at 30.

*Suarez-Valenzuela v. Holder*, 714 F.3d 241, 249 (4th Cir. 2013) ("[C]ontentions not raised in the argument section of the opening brief are abandoned.") (emphasis omitted) (quotation omitted). A party therefore waives review of any issues not fully developed in its opening brief. *See Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973–74 (4th Cir. 1997).

Second, even if we consider the Earlys' belated theory, Grandfather Early's intestate death and Grandmother Early's will do not create a genuine dispute of material fact. Neither of these facts contradict the evidence that Grandfather Early gave the Rockwells to Helen.

Starting with Grandfather Early's intestate death, the absence of a will must be considered in conjunction with the accounting of his estate and what his descendants said about that accounting. The detailed accounting of his estate did not mention the drawings. It's hard to imagine that possessions that were as valuable as those drawings were to him would not have been mentioned if he felt he still owned them; to the contrary, the accounting's silence about the drawings suggests Grandfather Early gave them to Helen. And recall that Grandmother Early, Helen and Thomas all signed documents agreeing to the accuracy of the accounting. Stephen didn't, but he didn't object, either.

As to Grandmother Early's will, she valued her "personal effects [and] household furnishings" at $3,000. The Rockwell drawings were worth $80,000. If she believed she owned a 50% interest in them, the $3,000 valuation of her personal property makes no sense. Then, neither Stephen Jr. nor Thomas mentioned an interest in the Rockwells in their estate documents. If they believed they were owners, why the silence? Finally, consistent

with the evidence that Grandfather Early gave the Rockwells to his daughter Helen, Helen's will expressly bequeathed the art to her children. All the evidence points one way. Even construing it in the light most favorable to the Earlys, there is no genuine dispute of material fact about who owned the Rockwells.

And that is before the presumption is added to the mix. Contrary to the Earlys' argument, Rule 56 does not say that courts addressing summary judgment motions should defer applying presumptions if that deferral would benefit the non-movant. Indeed, "presumptions are [] useful devices for allocating the burdens of proof between parties." *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988); *see* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally."). While the burden of persuasion remains with Elam, the presumption helps him carry that burden. *See, e.g.*, *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 115 F.4th 266, 278 (4th Cir. 2024) (applying a presumption of abandonment to shift the burden of persuasion at the summary judgment stage).[10]

---

[10] The dissent seems to adopt this position, insisting that the presumption is a "device for allocating the burden of proof when settling disputes as a matter of *fact*—not, as summary judgment does, as a matter of *law*." Diss. Op. at 24. But it cites to no law prohibiting its use at summary judgment. And doing so would seem inconsistent with the way the presumption operates under Virginia law. Under that law, the possessor of the property is presumed to be the owner unless the nonpossessing party asserts affirmative evidence of his ownership—not attacks on the possessor's claim. *Willcox*, 467 F.3d at 415. If the nonpossessing party does not do so, then there is no genuine dispute of material fact, and Rule 56 requires that the possessor prevail as a matter of law.

21

To sum up, the Earlys abandoned any argument rebutting the presumption based on the superiority of their title. But the estate documents belie any rebuttal argument, anyway. While the Earlys may have an argument that could show they have an equal title to the Rockwells, they have no evidence, which is what Virginia law requires. *See State of Maine*, 672 S.E.2d at 867 ("[T]he party not in possession of the disputed personal property [must] produce evidence of superior title."). With the presumption unrebutted, Helen's interest in the Rockwells was complete and exclusive. And because she passed that interest to Elam, superior title rests with him. Accordingly, we affirm the district court's quiet title ruling and its declaratory judgment.

### E. Common Law Claims

The Earlys' common law counterclaims cannot survive Elam's superior title. "Conversion is any wrongful exercise or assumption of authority . . . over *another's* goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it." *Mackey v. McDannald*, 842 S.E.2d 379, 387 (Va. 2020) (emphasis added) (internal quotation marks omitted). "A bailment has been broadly defined as 'the rightful possession of goods by one who is not the owner.'" *K–B Corp. v. Gallagher*, 237 S.E.2d 183, 185 (Va. 1977) (quoting 9 S. Williston, *Contracts* 875 (3d ed. 1967)). "To succeed in a detinue action, a plaintiff must . . . have property in the thing sought to be recovered . . . ." *McGrath v. Dockendorf*,

22

793 S.E.2d 336, 339 (Va. 2016) (cleaned up).[11] Because Elam owns the Rockwells, the Earlys have no right in the Rockwells, and these claims fail.

With no underlying torts remaining, the Earlys' conspiracy claim evaporates. "[C]onspiracy allegations . . . do not set forth an independent cause of action; instead, such allegations are sustainable only after an underlying tort claim has been established." *Dunlap v. Cottman Transmission Sys., LLC*, 754 S.E.2d 313, 317 (Va. 2014) (quoting *McCarthy v. Kleindienst*, 741 F.2d 1406, 1413 n.7 (D.C. Cir. 1984)). The district court properly dismissed these claims.

### III. Conclusion

Family disputes are often messy and always unpleasant. The presumption that Elam owns the Rockwells because Helen possessed them may not make this dispute any more pleasant, but it does help sort through the mess. Following Virginia law, we affirm the district court.[12]

*AFFIRMED*

---

[11] What's more, the conversion and detinue claims are untenable even under the Earlys' co-ownership theory, since even under that theory they have not established a right to immediate possession. "An action for conversion can be maintained only by one who has a property interest in and is entitled to the immediate possession of the thing alleged to have been wrongfully converted." *United Leasing Corp. v. Thrift Ins.*, 440 S.E.2d 902, 906 (Va. 1994). "To succeed in a detinue action, a plaintiff must . . . have the right to [the property's] immediate possession . . . and [] the defendant must have had possession at some time prior to the institution of the action." *McGrath*, 793 S.E.2d at 339 (cleaned up).

[12] We also deny Elam's motion to file a surreply brief.

23

RICHARDSON, Circuit Judge, dissenting:

The majority purports to tell a tale as old as time when applying the presumption of ownership from possession, yet it skips over a few hash marks on the relevant timeline. Once the proper history has been considered, we can see that the presumption has nothing to do with this appeal at all. And shorn of the presumption, this case can be seen for what it is: one large genuine dispute of material fact. So I would vacate the district court's grant of summary judgment for Elam and remand for further proceedings.

To be clear, I don't doubt the existence of the presumption of ownership from possession. Since the days of Hammurabi's Code, individuals embroiled in property disputes have been able to take their disputes to a factfinder. *See, e.g.*, *The Code of Hammurabi King of Babylon: About 2250 B.C.* § 9 (Robert Francis Harper trans., 2d ed. 1904); *The Twelve Tables*, *in* 1 *The Civil Law* 68 (S.P Scott trans., 1932) (Table VI). And if the ownership of the property was uncertain, a factfinder could use possession to break the tie. *See The Enactments of Justinian*, *in* 3 *The Civil Law*, *supra*, 209–10 (Gaius, *On the Provincial Edict*, Book VII); 1 *Bava Basra* § 43b (Babylonian Talmud) (Rabbi Hersh Goldwurm et al. eds., Rabbi Yosaif Asher Weiss trans., Schottenstein 1st ed. 1992).

But the factfinder was just that—a finder of facts. That's why, in the United States, the presumption that possession weighs in favor of ownership is, and always has been, a device for allocating the burden of proof when settling disputes as a matter of *fact*—not, as summary judgment does, as a matter of *law*. *See, e.g.*, *Maine v. Adams*, 672 S.E.2d 862, 865–67 (Va. 2009) (bench trial); *Perkins v. Greever*, 7 S.E. 391, 399, 409 (Va. 1888) (bench trial). Tellingly, the other cases cited by the majority apply the presumption before

24

a factfinder in the same way. *See Tate v. Tate*, 7 S.E. 352, 352 (Va. 1888) (factfinding by a master commissioner); *Smith v. Bailey*, 127 S.E. 89, 89 (Va. 1925) (bench trial); *Willcox v. Stroup*, 467 F.3d 409, 411 (4th Cir. 2006) (bench trial); *Cowherd v. City of Richmond*, 82 Va. App. 15, 19–20 (2024) (public hearing under Va. Code. Ann. § 15.2-1812(B)).

Despite this, the majority insists on applying this presumption at summary judgment. And it attempts to lend an air of legitimacy to its application by tracing the presumption's lineage back to Roman times, pointing to the Roman "legal doctrine" of "as you possess" as the presumption's predecessor. *Ante* at 11–12 (citing Eric Descheemaeker, *The Consequences of Possession* 21 (U. Edinburgh Sch. of L., Working Paper No. 2013/31, 2013)).[1] If the majority wishes to fight on Roman soil, I have no objection. But if we are to be in Rome, then we should do as the Romans did. And the Romans applied the presumption only before a factfinder.

The phrase "as you possess" is a translation of the Latin phrase "*uti possidetis*," the name of a type of *interdictum*. *See* Descheemaeker, *supra*, at 21. An *interdictum* was not, contrary to the majority's suggestion, a legal doctrine at all, but a type of order—vaguely akin to a preliminary injunction today—in the legal formulary system of the Roman Republic. *See* 4 *The Digest of Justinian* glossary (Alan Watson ed., 1985). These *interdicta* were issued by *praetors*—"important magistrate[s]" tasked with "the administration of private law." *Id.* "One remarkable point" about *interdicta*, the majority's

---

[1] My mentor and friend Richard Epstein will surely be pleased with the majority's recognition of the enduring relevance of Roman law. *Cf.* Richard A. Epstein, *The Natural Law Origins of Private and Public Law*, 17 N.Y.U. J. L. & Liberty 205, 205 (2024) (starting, as he often does, with Roman law).

own source notes, is that they were "*entirely independent from any question of ownership*." Descheemaeker, *supra*, at 19 (emphasis added). Instead, an *interdictum* protected possession itself, regardless of who the owner was, often to preserve the peace while the dispute over ownership was pending. *See id.*; *see also* Andrew M. Riggsby, *Roman Law and the Legal World of the Romans* 139 (2010) ("The general idea [of the *interdictum*] was to give some legal protection to the mere possession of property.").

The dispute over ownership—as opposed to mere possession—was instead settled through a separate legal proceeding called the *rei vindicatio*, where a judge would take evidence from both parties and conduct the equivalent of a modern-day bench trial. *See* Descheemaeker, *supra*, at 19; Riggsby, *supra*, at 138, 141–42. It is in the *vindicatio* proceeding where we see the predecessor of the presumption. Because a possessor of property could seek an *interdictum*, which allowed them to use the property without interference, they had no incentive to raise a property dispute themselves. Thus, when property came into dispute, "the current possessor would be defendant" in a *vindicatio* suit brought by the other party, "which of course was a considerable advantage" because the plaintiff would bear the "burden of proving ownership." Descheemaeker, *supra*, at 19, 21; *see also The Enactments of Justinian*, *supra*, at 209–10. In other words, the presumption of ownership from possession was not the *interdictum* itself, declared by the *praetor* without taking evidence of ownership, but a downstream consequence of the *interdictum* that applied *at trial before a fact-finding judge*. The Romans are no allies of the majority's position.

26

Without the presumption of ownership from possession in the way, we are left with a bare dispute over the ownership of the Rockwells. The parties in the case each present a plausible chain of title. Elam's theory of title is that in 1949, before dying intestate, Grandpa Early gave the Rockwells as an *inter vivos* gift to Helen, who then gave them to Elam in 2009. On the other side, the Earlys' theory of title is that Grandpa Early never gifted the Rockwells and that instead they passed via the ordinary intestacy laws along with the rest of his estate, splitting ownership between Grandma Early and her children. On this theory, each Early would have inherited a piece of Grandma Early's share upon her death and is entitled to a 1/3rd share of ownership today.

Each theory of title has severe problems. For Elam's theory, there doesn't appear to be any contemporaneous proof of any *inter vivos* gift from Grandpa Early to Helen in 1949. To the contrary, Helen herself stated in a letter to the Rockwell Museum that she was given the Rockwells in 1960, over a decade later; Grandma Early possessed the illustrations in the interim.[2] Potentially corroborating her letter date of 1960 is the fact that she may also have taken possession of the illustrations that same year—over a decade after the alleged *inter vivos* gift. And when making the decision about whether to lend the Rockwells to the White House, she consulted her brother—an alleged co-owner—before doing so. These are not the expected statements and actions of someone who was gifted the illustrations outright in 1949.

---

[2] In fact, it's unclear why the majority does not apply its interpretation of the presumption to Grandma Early's possession of the Rockwells.

It's not much better on the other side. For the Earlys, it's a puzzle why Grandpa Early's estate would have an accounting that listed $4 lighters and $2 radios but not these valuable Rockwells. The same puzzle is present for Grandma Early's estate, which was valued at $3,000 after accounting for all furniture and personal effects—a number that clearly did not include the value of the illustrations. Nor were the Rockwells brought up by Stephen Jr., Thomas, or Helen when divvying up Grandma Early's estate. Nor were they mentioned in Stephen Jr.'s estate upon his death. These, too, are not the expected statements and actions in estate planning of people who own a famous work of art.

With such scant evidence on each side and plenty of testimony in conflict, this case is the posterchild of jury questions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions."). But the majority doesn't see both sides of the disagreement. It only sees Elam's. The Earlys' attacks on the *inter vivos* gift that sits at the foundation of Elam's theory of title are simply ignored.

The majority discounts the legal significance of the Earlys' attacks (albeit in the context of erroneously discussing the presumption) because it believes that the lack of evidence for Elam's theory is not affirmative evidence for the Earlys'. The majority misunderstands the logical landscape of this case. Everyone agrees that if Grandpa Early never gifted Helen the Rockwells, then the Earlys' theory of title applies. That's because the Earlys' theory of title is the default chain of title from the standard rules of intestacy that apply if there is no *inter vivos* gift. As the likelihood of the *inter vivos* gift declines, the likelihood of default intestate succession goes up; the likelihood of the two theories are

28

mirror images of each other. So disproving the existence of an *inter vivos* gift to Helen would itself be affirmative evidence for the intestate succession theory of title that would allow a reasonable jury to find for the Earlys.

Of course, the Earlys might bear the burden of proof at trial because of the presumption of ownership from possession.[3] They might very well lose at the end of the day. But this is not trial. And we are not factfinders. I respectfully dissent.

---

[3] Maybe. Virginia has not, to my knowledge, applied the presumption in any case involving a dispute over potential joint ownership. The majority makes the *Erie* guess that the Commonwealth courts would do so. But the rationale for the presumption doesn't obviously apply. The presumption is a tiebreaker that applies in favor of the possessor when multiple parties assert mutually exclusive property interests—in such a case only one party has the right to possess, so tie goes to the possessor. But when, as here, a nonpossessor only claims *partial* ownership over shared chattel and admits that the possessor also has partial ownership, the nonpossessor has not asserted a mutually exclusive property interest. Joint ownership by both is entirely compatible with possession by one. In other words, possession is seemingly not indicative of exclusive ownership *as between co-owners*. *Cf.* 1 *Bava Basra*, *supra*, § 42a & nn.17–21 (explaining that the presumption does not apply between family members who may share possession of property). To use an example involving real property, if two roommates buy an apartment together, the fact that only one roommate is in the apartment does not imply a lack of ownership by the other. This case potentially appears to me to be similar. Fortunately, the Virginia courts are not bound by the majority's understanding of the presumption and are free to address the question as they see fit. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938).

29